2024 IL App (2d) 230062
Nos. 2-23-0062, 2-23-0063, 2-23-0080, 2-23-0089, 2-23-0090 cons.
Opinion filed January 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Nos. 22-DV-463 23-CC-2 |
| FRANK M. WEINSTEIN, | ) ) | |
| Defendant-Appellee | ) ) | Honorable Paul B. Novak |
| (The Department of Human Services, Appellant). | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 22-CF-1808 22-CM-1368 23-CC-1 |
| GABRIELLE RENEE DUNCAN, | ) ) | |
| Defendant-Appellee | ) ) | Honorable Paul B. Novak |
| (The Department of Human Services, Appellant). | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |

| | | |
|---|---|---|
| v. | ) | Nos. 22-CF-1438 |
| | ) | 23-CC-5 |
| LUIS BARRADAS-ALVARADO, | ) | |
| | ) | |
| Defendant-Appellee | ) | Honorable |
| | ) | Paul B. Novak |
| (The Department of Human Services, Appellant). | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 22-CF-1876 |
| | ) | 23-CC-6 |
| NILES CLARK, | ) | |
| | ) | |
| Defendant-Appellee | ) | Honorable |
| | ) | Paul B. Novak |
| (The Department of Human Services, Appellant). | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 22-CF-950 |
| | ) | 23-CC-7 |
| ELIZABETH SEBESTA, | ) | |
| | ) | |
| Defendant-Appellee | ) | Honorable |
| | ) | Paul B. Novak |
| (The Department of Human Services, Appellant). | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    In these consolidated appeals, the circuit court, in five criminal actions, found defendants,

Frank Weinstein, Gabrielle Duncan, Luis Barradas-Alvarado, Niles Clark, and Elizabeth Sebesta,

unfit to stand trial and ordered that they be placed into the care of and provided inpatient fitness restoration treatment by the Department of Human Services (Department). Subsequently, the court held the Department in indirect civil contempt of court for failing to obey those orders and comply with certain statutory mandates (725 ILCS 5/104-17 (West 2020)) and it imposed a $500-per-day fine in each case until the defendant was placed and provided treatment. The Department appeals. Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016) ("[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty" vests jurisdiction in the appellate court without a special finding). The Department argues that the court erred in finding it in indirect civil contempt, where (1) there was no *prima facie* evidence of noncompliance with the court's unfitness orders; (2) in determining defendants established *prima facie* cases of contempt, the court improperly relied, in part, on the Department's purported noncompliance with a statute, rather than the court's orders; and (3) the evidence did not show willful and contumacious refusals to obey the court's orders. We affirm.

¶ 2                                  I. BACKGROUND

¶ 3     In each of five criminal cases, the trial court entered an order finding the defendant unfit to stand trial and remanding the defendant to the Department's custody for inpatient treatment. Delays by the Department in taking each defendant into its custody and providing treatment led to findings of indirect civil contempt against the Department.

¶ 4                                  A. Duncan

¶ 5     On November 15, 2022, the trial court found Duncan, who had been charged with domestic battery, unfit to stand trial. It ordered the sheriff to transport Duncan to and place her in the custody of the Department and ordered the Department to determine the appropriate placement for Duncan and provide her treatment. The court also ordered the Department to provide, within 30 days, an

opinion as to the probability of Duncan attaining fitness within one year and, if there was such a probability, to file a treatment plan. Finally, the court ordered the Department to file a progress report at least seven days before a status hearing set for December 20, 2022. On December 2, 2022, the Department notified the court that it had completed an evaluation of Duncan on November 30, 2022, which suggested that she remained unfit to stand trial and that the Elgin Mental Health Center (Elgin) was the most appropriate inpatient setting for a formal assessment. The Department stated that it would notify the sheriff of admissions availability and coordinate Duncan's transfer. At that time, a clinical opinion and treatment plan would be rendered and reported to the court.

¶ 6    On December 20, 2022, Duncan petitioned for a rule to show cause because she had not, as of the date of her petition, been transported to a Department facility for treatment. On December 27, 2022, the trial court issued the rule to show cause, finding that the Department had wholly and willfully failed and neglected to comply with the statute and the court's order. It set the case for hearing.

¶ 7    On January 24, 2023, the evidentiary hearing commenced on Duncan's petition. Initially, the court heard argument on whether Duncan presented a *prima facie* case.. The Department argued that it did not fail to comply with the court's order, as there was no timeline for it to admit Duncan into custody, and that the failure to comply with a statute cannot be the basis of a contempt finding. The court found that Duncan had established a *prima facie* case.

¶ 8    The Department called Agoritsa Barczak, its forensic court services administrator, who testified that she had a doctorate in clinical psychology with a forensic specialization. She oversaw admissions and treatment of forensic individuals who had been remanded to Department custody as either unfit to stand trial or not guilty by reason of insanity. Addressing the issues at the Department's mental health facilities, Barczak testified that the primary issue was the dramatic

increase in referrals. While the Department had worked to add capacity and space to accommodate the referrals, staffing vacancies had also increased. The Department had trouble adding and keeping staff, which was also a nationwide issue. The referral increase was significant; specifically, in the first half of 2022, as compared to the same period in 2021, referrals increased nearly 44%, which tapered off in the second half of the year to about a 20% increase as compared to before the COVID-19 pandemic. Prior to the increase, 80 to 100 individuals were on the waiting list "on a bad week," whereas, 265 individuals were currently on the list and it had consistently been at that figure for two years.

¶ 9    Barczak addressed the Department's efforts to increase capacity, explaining that it had repurposed spaces, including converting units previously used during the pandemic as triage units to accommodate several beds. It also assumed two units at Elgin that previously had been turned over to the Department of Corrections, which added 44 beds (of which 16 had already been occupied; some of the staff initially hired for these additional beds was no longer with the Department and, thus, more beds could not be filled). The Department also contracted with Ingalls Memorial Hospital in Harvey (Ingalls), adding about 24 beds (12 of which were added since the beginning of 2022), all of which were occupied. Addressing Lake County, Barczak testified that about 65 to 70 beds had been added with the additional two units at Elgin and the unit at Ingalls. The Department was looking to expand further.

¶ 10   At Elgin, the Department increased its internal utilization review of cases, in which it currently assessed on a monthly (formerly quarterly) basis individuals who were still in custody past 30 or 60 days and tried to provide assistance to staff to speed up fitness restoration or accommodate individuals. The Department was also looking into outpatient restoration. Further, in recent years, the Department began operating its facilities as one statewide team, rather than

regional areas; thus, individuals could be placed at the first clinically appropriate bed anywhere in the state. As to staffing, the Department was placing advertisements and reaching out to temporary staffing services, including seeking out retired staff to return on a time frame contract.

¶ 11 Barczak explained that, after a defendant was referred to the Department for inpatient fitness restoration review, a preplacement evaluator would conduct a preplacement evaluation within seven days. The evaluator would recommend whether the defendant needed inpatient treatment and, if so, the location where they should be placed. The evaluation was typically conducted in person, but some cases required a video or telephone evaluation. The evaluator was expected to follow up with the jail and its mental health staff every two weeks regarding the defendant's status. The full evaluation, which assessed a defendant's probability of attaining fitness within one year and the proposed treatment plan, was conducted *only* once the defendant is taken into Department custody.

¶ 12 On January 11, 2023, the Department received an update concerning Duncan's condition and subsequently prioritized her admission. It was based on clinical need. Further, Barczak informed the court that Duncan would be admitted to a Department facility within two to three weeks of the hearing.

¶ 13 The Department had about 20 preplacement evaluators. Daidra Marano, whom Barczak supervised, was a psychologist assigned to conduct preplacement evaluations in Lake and about six other counties. For Duncan, Elgin was the only placement option because she was female, she was not appropriate for a lower security location such as Ingalls, and because of Elgin's geographic proximity. However, if a bed opens at McFarland Mental Health Center (McFarland) or Alton Mental Health Center (Alton), the Department would designate that bed for Duncan.

¶ 14 In placing individuals, the Department's first consideration was clinical necessity and then court date. There were cases where the evaluator received information about an individual decompensating; the Department relied on that information without independently verifying the individual's current state through personal contact. The 20-day evaluations were supposed to be conducted in person, but it would depend on the evaluator. Evaluations for the 30-day reports were conducted in person.

¶ 15 Barczak explained that violations of the statutory time frame for placement of individuals predated the pandemic but had worsened since the pandemic. Rules to show cause were filed against the Department prior to the pandemic, but not with the frequency with which they were currently being filed.

¶ 16 Duncan's preplacement evaluation was completed over the telephone, like the majority of cases in Lake County. Barczak did not believe that this was acceptable. On January 11, 2023, Marano consulted with Deputy Chief Nicholas Kalfas of the Lake County Sheriff's Office, who had spoken to someone in the jail's mental health center and related that Duncan "was not looking good."

¶ 17 Between January 11 and January 24, 2023, Marano had not seen Duncan in person. (Barczak became aware of this at the hearing.) Barczak acknowledged that there were circumstances where something needed to be done by telephone, such as when jail personnel believed that it would not be safe to remove someone from his or her cell, the individual was too paranoid to sit in front of a videoconference screen or telephone, or he or she was too violent. Jail personnel typically would make this assessment.

¶ 18 Based on information that Marano received from the jail, Duncan was considered inappropriate for in-person evaluation. However, Marano's general practice was to conduct

examinations over the telephone with everyone. Kalfas was not a mental health professional, and, according to Barczak, he did not consult with the mental health staff at the jail.

¶ 19 Barczak further testified that, during the pandemic, most jails did not allow in-person visitation and the Department had to find ways to work around this restriction. The telephone evaluations came into play, as well as videoconferencing. Marano informed Barczak recently that Lake County jail was not in favor of videoconferencing; however, they were not unable to do so.

¶ 20 Kalfas testified that he was the deputy chief of the adult correctional division at the Lake County Sheriff's Office. He was responsible for transporting individuals in the jail's custody to other facilities and was the point person for individuals in custody who have been found unfit to stand trial. Once the Department had a bed available for an individual, Kalfas and his staff would transport him or her there within one week at the most.

¶ 21 According to Kalfas, the jail never stopped allowing in-person visits, including during the pandemic. It also had not stopped allowing Department staff to visit the jail in person. Since March 2020, neither Marano nor anyone else from the Department regularly visited the jail. Until recently (*i.e.*, January 2023), Marano had visited in person only in July 2022. Marano would call the jail to schedule telephonic preplacement evaluations with inmates. After the evaluations, she regularly (*i.e.*, every one to two weeks) e-mailed, asking for updates on all the inmates that were currently on the Department's waiting list. Kalfas then would call the mental health director or one of the social workers and go through the list with them, asking questions such as if there were any changes in the inmate's behavior or if they had become more acutely psychotic.

¶ 22 Kalfas testified that, currently, no one at the Department communicated with jail mental health staff. Prior to October 2022, the jail had a director of mental health who spoke to Department

personnel about inmates. She left the jail's employment in October 2022 and was recently replaced. The new director had not had any contact with the Department.

¶ 23    Regarding Duncan, Kalfas denied that he advised the Department that they could not visit her in person based on any behavioral or other concerns. Duncan was currently a level 2 inmate, which meant that she was combative with staff and incorrigible. Duncan was not receiving psychotropic medications. He explained that the jail could facilitate visits where the interviewer and the inmate are separated by a clear partition. It could also bring interviewers to the door of the cell, which has a window where observation is possible. The phone option was not private.

¶ 24    On January 27, 2023, the trial court found the Department in indirect civil contempt for failing to follow the court's November 15, 2022, order and fined it $500 per day until the contumacious conduct was purged by providing Duncan appropriate treatment. It determined that Duncan had established a *prima facie* case and that the Department had failed to meet its burden of showing that the violation (its failure to provide treatment to Duncan) was not willful and contumacious. It noted that it had ordered that the Department have Duncan transported to a facility and provide treatment. The court found that the Department did not send a treatment team to the jail to assess Duncan. It found that the fact that Barczak did not know that her subordinate was not coming to the jail showed willfulness. The Department was "doing [ ] nothing" while Duncan was in jail.

¶ 25    One month later, Duncan was transported to Elgin, and the court determined that the Department's contumacious conduct was purged, with $12,000 having accrued in fines. The Department appeals.

¶ 26                    B. Weinstein

¶ 27    On November 22, 2022, the trial court found Weinstein, who had been charged with domestic battery and aggravated assault, unfit to stand trial and entered an order like that in Duncan's case. On December 13, 2022, the Department notified the court that a preplacement evaluation was completed on December 8 and that the results suggested that Weinstein remained unfit to stand trial and that Elgin was the most appropriate inpatient setting for a formal assessment. The Department stated that it would notify the sheriff of admissions availability and coordinate Weinstein's transfer. At that time, a clinical opinion and treatment plan would be rendered and reported to the court.

¶ 28    On January 4, 2023, Weinstein petitioned for a rule to show cause, asserting that he remained in the Lake County jail well over 30 days after being ordered into the Department's custody and that he was receiving no fitness restoration treatment, had not received a formal evaluation, and had not received a treatment plan. Weinstein also asserted that the Department provided a status letter on December 13, 2022, informing the court that the Department would conduct a formal assessment only upon admission to their facility. Weinstein sought issuance of a rule to show cause as to why the Department should not be held in contempt of court for failing to place him into treatment and failing to comply with the court's order for a status report. On January 10, 2023, the court issued the rule, finding that the Department had "wholly and willfully failed and neglected to comply with" statutory mandates and the court's November 22, 2022, order. It set the matter for hearing.

¶ 29    At the January 31, 2023, evidentiary hearing, after argument, the trial court found that Weinstein had established a *prima facie* case. The court noted that it had ordered Weinstein to receive treatment from the Department—specifically ordering that he be transported to the Department's custody and that the Department determine the appropriate placement and provide

treatment—and that the statute required the Department to file a 30-day report, none of which were completed. Accordingly, it further noted, the burden shifted to the Department.

¶ 30    The Department called Marano. Addressing the issues faced by the Department's mental health facilities, Marano testified that some facilities had been closed, thus leading to a shortage of beds. Also, since the pandemic, there had been an employee shortage. Marano testified that, when she began her job in September 2020, she was told that she would work from home; she was also told not to go into jails "right now."

¶ 31    Marano was responsible for the Lake County region. She conducted an in-person reevaluation of Weinstein on January 25, 2023. (Another doctor—Dr. Simonic—had conducted the preplacement evaluation because Marano was on vacation.) Weinstein reported that he was taking Depakote. At the time of the hearing, it was anticipated that Weinstein would be placed within three weeks. Marano did not write a report about her findings from January 25. The first time someone from the Department saw Weinstein in person after he was found unfit, on November 22, 2022, was Marano, on January 25, 2023.

¶ 32    Marano further testified that her boss, Barczak, contacted her after hearings on January 24, 2023, and instructed her to go to the Lake County jail to see everyone who was still unfit to stand trial. Mariano had not seen, or attempted to see, anyone in person at the jail since July 2022, and, prior to that, she worked remotely due to the pandemic. According to Marano, Kalfas never told her that she was not allowed to come to the jail. Rather, Kalfas told Marano that his preference was for her to conduct phone interviews. In person, Marano testified, is the superior way to conduct a preplacement evaluation, and her bosses have relayed this to her.

¶ 33    If there are no in-person visits or phone calls after the preplacement evaluation, Marano would ask Kalfas for monthly or biweekly updates for persons she is tracking, *i.e.*, everyone in the

Lake County jail who is unfit to stand trial and awaiting placement. Kalfas then would ask the jail's mental health director for updates.

¶ 34    Marano was responsible for other jails. At other jails, where mental health departments are willing to do so, Marano had provided fitness materials for the defendants to study. Weinstein, she explained, did not understand fitness terminology.

¶ 35    The Lake County jail does not offer a videoconferencing option. Beginning in July 2022, the Department allowed Marano and her colleagues to go back into the field, *i.e.*, the jails, for special circumstances. In July 2022, Kalfas told her his preference was for phone calls because he was short-staffed.

¶ 36    As of the date of the hearing, Weinstein had not received any treatment from the Department. The Department did not provide treatment until a defendant is taken into its custody. Weinstein informed Marano when she visited him in late January 2023 that he was taking medication to treat his illness.

¶ 37    The State called Kalfas. He denied telling Marano that he preferred phone interviews to in-person interviews at the jail.

¶ 38    On January 31, 2023, the trial court found the Department in indirect civil contempt of court for its failure to follow the court's November 22, 2022, order that it treat Weinstein and further found that its violation was willful and contumacious. It fined the Department $500 per day until its contumacious conduct was purged by providing treatment for Weinstein. Specifically, the court determined that the Department's "position is untenable." Referencing the statute, the court noted that it required that a defendant undergo treatment within 30 days of the entry of an order:

"And 17(e) clearly says that they're supposed to provide a number of different things to the Court, a description of the treatment plan, all these kind of different things, but the court order that's in question says that the [D]epartment's supposed to provide treatment.

And the Court's belief is that that should be within 20 days, but even assuming— even assuming the [D]epartment's reading is correct, that they're not required to have the defendant arrive at the facility within 20—20 days, the [D]epartment's position is that he's not going to receive treatment for 77 days, this three-week period on top of what he's been here—he's been here since November—November 22nd, and so it's approximately 65 days, somewhere around there, if my math is incorrect. But 65 days without receiving a lick of treatment.

And I don't understand. The [D]epartment is clearly making the decision to not treat people until they get to the facility. That's a decision they're making. That goes to willfulness. That absolutely goes to willfulness because the [D]epartment says they can't— they won't do it until they get to the facility."

¶ 39    The trial court further referenced Marano's testimony that, at other jails, she would provide information to defendants concerning fitness terminology (*i.e.*, educational material concerning fitness terms) and that she had never done that at the Lake County jail.

¶ 40    Subsequently, on February 14, 2023, defendant was transported to Elgin for treatment, and, on February 21, a 30-day treatment report was submitted to the court regarding the Department's opinion that he can be restored to fitness within one year of the unfitness finding. On February 21, 2023, defense counsel withdrew the petition for a rule to show cause and the court ordered that the contumacious conduct was purged and that the total fine was $6500. The Department appeals.

¶ 41                              C. Barradas-Alvarado

¶ 42    On November 8, 2022, the trial court found Barradas-Alvarado, who had been charged with violating an order of protection and criminal trespass, unfit to stand trial and entered an order like that in the other defendants' cases. On November 29, 2022, Marano informed the court that she had completed a preplacement evaluation of Barradas-Alvarado on that date, which suggested that he remained unfit to stand trial and that Elgin was the most appropriate inpatient setting for a formal assessment. Marano stated that the Department would notify the sheriff of admissions availability and coordinate Barradas-Alvarado's transfer. At that time, a clinical opinion and treatment plan would be rendered and reported to the court.

¶ 43    On December 20, 2022, defendant petitioned for a rule to show cause, asserting that he had yet to be transported to a Department facility for treatment. On the same date, the trial court issued a rule to show cause, finding that the Department had wholly and willfully failed and neglected to comply with the statute and the court's November 8, 2022, order.

¶ 44    On January 30, 2023, an evidentiary hearing commenced. Initially, the court heard arguments on whether a *prima facie* case was established. The Department took the position that the court's order did not include a time frame for the Department to comply with and the order was the proper focus to assess contempt. It also argued that it was not required to provide treatment unless a defendant was in custody at one of its facilities. The court determined that its order was clear and that the statutory deadlines had not been met. Thus, it found that Barradas-Alvarado had established a *prima facie* case and that the burden therefore shifted to the Department.

¶ 45    The parties stipulated to the contents of the January 20, 2023, declaration of Sharon Coleman. Coleman, the Department's deputy director of forensic and justice services for the division of mental health, was responsible for the Department's forensic treatment programs. The

division operated the state's six mental health centers. Since May 2020, the division had admitted over 1600 patients to its forensic treatment programs. Since January 2022, there had been a 20% increase in courts' forensic referrals for Department inpatient care, with 90 referrals in October 2022, a record. The waiting list for inpatient admissions consisted of 193 individuals, plus 72 individuals pending assessment for placement (most of whom would require inpatient admission).

¶ 46 Coleman further stated that, in addition to the substantial increase in forensic referrals, the division also faced a shortage of qualified mental health professionals and other staff. This was reflective of national trends. With considerable recruiting efforts in the past year, the division had hired over 500 employees for its 24/7 facilities, but, with offsetting attrition driven by the pandemic and the workforce crisis, vacant positions had increased by 50%. The average number of vacancies at such facilities was 303 in 2021 and 404 in 2022. The Department partnered with the Department of Central Management Services to expand recruitment efforts, including increasing salaries for entry-level mental health technicians, prioritizing hiring at critical sites, participating in recruitment events, and targeting hiring of nurses.

¶ 47 Another challenge Coleman noted was that there were limited opportunities for community placement of individuals exiting inpatient forensic treatment based on their court-ordered conditional release. This restricted the pace of discharge and ability to free up beds for new admissions. She also addressed the division's efforts to expand forensic capacity, which included establishing 24 minimum-security beds at Ingalls, opening space at Alton to accommodate 22 new forensic beds, repurposing space at McFarland to add 24 new forensic beds, reclaiming space at Elgin and, thereby, adding 22 new forensic beds in November 2022 and 22 new beds in January 2023. The division was also repurposing 18 minimum-security beds at Chicago Read Mental Health Center and 5 minimum-security beds at Choate Developmental Center for patient "step

down," thereby freeing up existing beds in the system for unfit-to-stand-trial admissions. It was also making extensive capital improvements at an unused building at Alton to create up to 90 additional forensic beds (with a potential fall 2024 opening). The division was exploring additional partnerships with private hospitals to provide additional inpatient restoration beds, as well as additional step down options for not-guilty-by-reason-of-insanity individuals appropriate for conditional release or discharge from inpatient care at the Department, which would open up additional inpatient forensic beds.

¶ 48    Coleman also testified. She stated that, initially, Barradas-Alvarado had been directed to Elgin (in a medium-security unit) but was now directed to Chester Mental Health Center (Chester) (also in a medium-security unit); Elgin's capacity was full. Barradas-Alvarado was previously treated at Chester's medium-security unit. Currently, the waiting list at Chester was 40 to 50 individuals. In order to admit new individuals, others must be discharged. At Elgin, there were about 30 to 40 individuals on the waiting list for admission. (Every facility had a waiting list, totaling 250 people across the state. There was a waiting list even 10 years ago, and there were staff shortages, though of a lesser extent, before the pandemic.) However, if a bed became available at another treatment program that was consistent with patient needs, the Department would make a change. (Coleman estimated that, as of the hearing date, Barradas-Alvarado's wait time for a bed was two to three additional weeks.)

¶ 49    Barradas-Alvarado was redirected to Chester because Marano's most recent review of his clinical status the prior week (January 25, 2023) identified Chester's medium security unit to be just as appropriate a treatment program as Elgin's.

¶ 50    Generally, individuals were prioritized according to the date of the court order, but the list was reprioritized daily based on the clinical condition of any one patient. If an individual was

deteriorating in the jail, they may be expedited and placed ahead of someone who had been waiting longer. As for Barradas-Alvarado, others had been prioritized over him in Lake County. The onus was on the Department, not the jail, to obtain the clinical update, and the Department's policy is to monitor individuals awaiting transport every two weeks.

¶ 51    Prior to January 25, 2023, the only direct contact the Department had with Barradas-Alvarado was during the preplacement evaluation in November 2022. Barradas-Alvarado was interviewed over the phone because Marano had recently had arm surgery. At that time, he was not taking his medication; he had refused it.

¶ 52    The preplacement evaluation was supposed to occur within 7 to 10 days of receipt of the referral. The evaluator would determine the individual's clinical condition and need for inpatient treatment and which hospital would best suit the individual's needs. The Department tried to keep individuals geographically close to their courts.

¶ 53    Addressing whether the Department could attempt to initiate treatment in the jail, Coleman testified that most of the individuals who awaited inpatient admission were psychiatrically ill and either unmedicated or undermedicated. She stated that it was clinically not possible or prudent to attempt fitness restoration in terms of didactic education for individuals who were psychiatrically ill. They were not able to benefit from it, and the Department did not have the staffing to go into a jail to provide psychiatric services. Coleman further testified that she did not believe that the Department even had the authority to provide services on-site (per MW). Nor did the Department have the resources to create a treatment plan in the jail, because it was a multidisciplinary process involving social workers and nursing, psychiatric, and medical staff. She estimated that 97% of the individuals referred were not taking their medication or were poorly compliant and very psychiatrically ill. There wa no ability to enforce medication compliance in the jail environment.

Prior to the pandemic, there were discussions between the Department and the Lake County jail about doing jail-based restoration. Nothing had moved forward on it, but Coleman conceded that it was possible to provide some level of treatment for individuals who have started medication in jail, noting that the Department had assessed and found people fit while in custody at the jail; however, that occurred with a "small minority" of individuals and usually those who voluntarily decide to comply with medication. Currently, the Department was considering pilot programs and looking at funding and providing services directly in the jails. This may include elements of jail-based restoration.

¶ 54 Coleman testified that it was concerning that Marano had appeared in person at the jail only twice since July 2022 (if the July 2022 visit was her only visit in three years). The Department's preference was that people see individuals on-site and in person. About one week before her testimony, Coleman learned that Marano had not been coming to the jail on a regular basis. In response, she reaffirmed to Marano the Department's protocol that evaluations must be on-site, unless the jail determines that someone is too violent to be seen in person or for other reasons.

¶ 55 Addressing the Lake County jail's mental health services, Coleman testified that it had such services but they were not "significantly robust for the kind of individuals that are waiting for an inpatient admission to" the Department. Thus, there were fewer mental health resources at the jail and, relative to other jails (such as Cook County, which has a fully functioning hospital), people tended to decompensate quicker at the Lake County jail. They would go without treatment longer and, therefore, the Department prioritized these inmates over others in many cases.

¶ 56 Addressing budgeting, Coleman testified that the Secretary of Human Services and Governor's offices "have been clear that they are affording all resources to this." Thus, the issue

was not budget but staffing, which predated the pandemic; the Department had been unable to hire. There was a "significant deficit in psychiatry," and the Department could not run hospitals without psychiatrists. The Department had tried to hire "within the state employees" and use outside vendors. The feedback it received was that individuals were not interested in working in state hospitals when there were "better" (*e.g.*, telehealth work as opposed to clinical work in facilities) opportunities. As to compensation, Coleman testified that the Department had adjusted the pay scale for many disciplines to incentivize people to work for it, including in psychiatry. Also, in the past year, there were 249 recruitment events with 9746 attendees.

¶ 57     Next, Marano testified as an expert in forensic psychology. She first interacted with Barradas-Alvarado in September 2021, when she conducted a phone interview with him. He was found unfit to stand trial and was sent to Chester. With respect to this case, Marano reengaged with Barradas-Alvarado via a desk review (*i.e.*, not a phone evaluation but a review of records, court paperwork, medical chart, LEADS information, arrest report, and psychological evaluations) on November 10, 2022, and creating a letter recommending that he be admitted to Elgin. She did not interact with him until January 25, 2023, when Marano conducted a follow-up evaluation that consisted of a five to ten minute "cell-front" evaluation. She concluded that Barrados-Alvarado had a fair understanding of court terminology. He was a medium security risk, and either Elgin or, preferably, Chester, whichever becomes available first, would be a proper placement. Chester is more appropriate because of Barradas-Alvarado's escape history, which Marano learned about in January 2023 when she visited him. He was in a segregated unit due to, according to an officer, failing to follow rules, refusing to exit his cell, flooding the cell, stopping up the toilet, and being verbally aggressive to females. Barrados-Alvarado was not taking medication.

¶ 58   Marano spoke to Kalfas about Barradas-Alvarado via e-mail. When asked again about her desk review, she reaffirmed that, without speaking to Barradas-Alvarado, she made the determination that he remained unfit to stand trial and that it was substantially probable that he will attain fitness within one year.

¶ 59   In November 2022, Marano had tendon surgery and she could not use her hand or a computer because she wore a cast. She continued working and conducted desk reviews, "because otherwise everything would have been further delayed." She believed she would not have been permitted in the jail while wearing a cast, assuming the jail's policy was similar to the Department of Corrections' policy. She acknowledged, however, that the jail had clear partitions.

¶ 60   Kalfas told Marano in July 2022 that he was understaffed and that it was best to proceed with phone evaluations. Marano also offered to do "Webex" videoconferences but was told that was not available.

¶ 61   Next, Kalfas testified that the jail did not have a policy precluding people who were wearing casts after medical procedures from visiting the jail. The jail did not allow professional visits through videoconferencing, but it did have a noncontact visit option, specifically, with a clear partition.

¶ 62   Currently, mental health services were contracted to Wellpath, which provided an on-site psychiatrist for six hours per week. The jail also had a director of mental health, who worked 40 hours per week, and a social worker, who worked 16 hours per week.

¶ 63   Kalfas would communicate with Marano via e-mail once every few weeks. She would respond via e-mail to schedule phone interviews. When a new case came in, Kalfas e-mailed Marano fitness paperwork, as well as discovery, medical records, and other material.

¶ 64   The parties stipulated to the admission of Barczak's testimony from Duncan's case.

¶ 65    On February 14, 2023, the trial court found the Department in indirect civil contempt and fined it $500 per day until it purged its willful and contumacious conduct by providing Barradas-Alvarado treatment. It noted that, on November 8, 2022, it ordered the Department to treat Barradas-Alvarado and provide, within 30 days, an opinion as to the probability that he could attain fitness within one year. Addressing willfulness, the court noted that the Department is in charge of its own facilities and it found that the delays were budgetary. Department personnel are working for less pay and in "less than ideal circumstances." The court found that, if personnel were paid more, there would be more employees. Further, the court noted that there were 28 beds, according to Coleman, but a backlog of 250 people, which, it determined, was relevant to consider as to willfulness. The court also noted the jail restoration program, which had not been pursued, and the years-long waiting list.

¶ 66    As to Barradas-Alvarado, the court noted that he had been in jail for 94 days with no treatment, which was "unconscionable." The Department never filed a motion asserting that it would not be able to comply with the statute; rather, its actions were "reactive," which factored into the court's willfulness determination.

¶ 67    The Department's contempt was purged on February 21, 2023. It appeals.

¶ 68                          D. Clark

¶ 69    On December 20, 2022, the trial court found Clark, who had been charged with attempted residential burglary, unfit to stand trial and entered orders like those in the other defendants' cases. On January 23, 2023, the Department informed the court that it had completed a preplacement evaluation of Clark on December 28, 2022, which suggested that he remained unfit to stand trial and that Elgin was the most appropriate inpatient setting for a formal assessment. The Department

stated that it would notify the sheriff of admissions availability and coordinate defendant's transfer. At that time, a clinical opinion and treatment plan would be rendered and reported to the court.

¶ 70    On January 24, 2023, Clark petitioned for a rule to show cause as to why the Department should not be held in contempt of court for failing to abide by the court's December 20, 2022, order. Specifically, Clark asserted that the Department's status letter on January 23 was dated 34 days after his assessment and that he had not yet been transported to a Department facility or provided treatment.

¶ 71    Also on January 24, 2023, the trial court issued the rule and set the matter for hearing. The evidentiary hearing commenced on February 14, 2023. The Department noted that, as in a previous case, it requested that the court discharge the rule it had entered. The court denied the Department's request and noted that, therefore, the burden had shifted to the Department.

¶ 72    The Department called Tima Smith, a clinical psychologist who worked as a preplacement forensic investigator for the Department. Smith testified that she was initially assigned to Clark's case because Marano was on vacation. She attempted to conduct a preplacement evaluation via telephone on December 28, 2022, but, initially, Clark did not come to the phone. He eventually came to the phone, Smith explained her role, and then Clark put down the phone and, per a sheriff's deputy, walked away. Smith explained that she attempted the evaluation via telephone because she had tested positive for COVID-19. Marano was currently assigned to the case.

¶ 73    No one else was available to conduct the evaluation because, within a two-week period, Smith's division was short three evaluators—two were on vacation and one retired. Only two individuals were available to cover 18 counties.

¶ 74 Once Clark ended the call, Smith conducted a desk review. She recommended Elgin because Clark was not exhibiting aggression and was not on medication. She noted that her observations were consistent with the fitness evaluator's observations.

¶ 75 Addressing Clark's interaction with Smith on the phone, Smith stated that he made statements indicative of active paranoid delusions. Clark felt that the state was against him, and he wanted to sue. He was very agitated and displayed thought disorganization. This aligned with the fitness evaluator's report that Clark was schizophrenic.

¶ 76 Smith was assigned to Clark's case from December 22, 2022, to January 4, 2023. During that time, she received no updates from the jail regarding his status there. Sometimes, jails initiate contact if someone is in distress or exhibiting extreme behaviors. Clark did not receive any restoration treatment in the jail.

¶ 77 Next, Marano testified that she met with Clark on January 25, February 16, and February 23, 2023. On January 25, Marano visited Clark at the jail and reviewed fitness terminology. His symptoms interfered with his ability to understand the terminology. Marano reviewed Smith's recommendation for placement and felt it was appropriate. Also, Marano met with the jail's mental health director and discussed the individuals on her caseload and their needs. (A new mental health director started at the jail in December 2022.) Marano asked Clark if he was willing to take medication, and he replied that he was not willing to do so.

¶ 78 Marano next saw Clark on February 16, 2023, and he did not mention as many delusions that day. He wanted to understand how he could engage with the court, so they discussed options. Marano did not move forward with a formal evaluation because Clark began exhibiting symptoms. Clark became mad and then left.

¶ 79    Marano's final visit to see Clark was on February 23, 2023. During the visit, she went to Clark's cell and spoke to him through the door because his unit was on lockdown due to quarantine. Her evaluation was not in depth because other people could overhear. Clark reported that he was doing okay and was feeling claustrophobic and irritable but was not as angry. He was calm, and his room was orderly and clean. Based on this evaluation, Marano did not change her recommendation for him.

¶ 80    Currently, Marano would visit the jail every Thursday and sometimes on Tuesday. She had asked for updates on individuals at the jail. She returned from vacation on January 3, 2023, and did not visit the jail until January 25, 2023. She returned after she had her cast taken off and pursuant to an order directing Department employees to do so.

¶ 81    Next, the parties stipulated to the admission of Barczak's testimony from Duncan's case, Coleman's testimony from Barradas-Alvarado's case, as well as Coleman's declaration from Barradas-Alvarado's case.

¶ 82    The trial court, on February 24, 2023, found the Department in indirect civil contempt, determining that the Department's conduct was willful and contumacious for failing to follow the court's December 20, 2022, order to properly issue its 30-day report and to have Clark transported to and provided treatment at a Department facility. The court also determined that the Department was not spending sufficient funds to have individuals in the jail transferred and provided treatment. The court noted that the individuals were presumed innocent of the charges against them and that the Department had decided not to treat individuals in the jail or to provide them medication. It also was not making sufficient efforts to more quickly transfer individuals to its facilities. The court found that the waiting lists predated the pandemic. The court ordered the Department to pay $500 per day until it purged its contempt by providing treatment to Clark.

¶ 83    In March 2023, Clark was transported to Elgin and the Department submitted a treatment plan with an opinion as to the probability of his attaining fitness within one year. On March 14, 2023, the court found that the Department had purged its contumacious conduct and that the total accrued fine was $6500. The Department appeals.

¶ 84                                    E. Sebesta

¶ 85    On December 13, 2022, the trial court found Sebesta, who was charged with false alarm/complaint to 911 and speeding, unfit to stand trial and entered an order like those in the other defendants' cases. On December 21, 2022, the Department informed the court that it had completed a preplacement evaluation of Sebesta on that date, which suggested that Sebesta remained unfit to stand trial and that Elgin was the most appropriate inpatient setting for a formal assessment. The Department stated that it would notify the sheriff of admissions availability and coordinate Sebesta's transfer. At that time, a clinical opinion and treatment plan would be rendered and reported to the court.

¶ 86    On January 24, 2023, Sebesta petitioned for a rule to show cause, alleging that the Department had not transported her to one of its facilities to undergo treatment and that it had not provided any additional status reports or findings related to her ability to attain fitness within one year. Also, on January 24, 2023, the trial court issued a rule to show cause, finding that the Department had "wholly and willfully" failed and neglected to comply with the statute and the court's December 13, 2022, order. It set the case for hearing.

¶ 87    At a February 14, 2023, evidentiary hearing, the Department conceded that a *prima facie* case had been established and that the burden had shifted to it. It called Marano, who testified that she was assigned to Sebesta's case in December 2022. On December 21, 2022, she conducted a preplacement evaluation over the telephone and recommended that Sebesta go to Elgin for

treatment. Following the evaluation, Marano went to the Lake County jail on January 25, 2023, and saw Sebesta in person. She testified that Sebesta had a good knowledge of legal terminology. She was upset that she was wearing clothing that, as she told Marano, meant to her that she was identified as being aggressive. Sebesta was not on any medication and requested a specific medication and Marano contacted the mental health director about it. Marano was scheduled to see Sebesta again on February 16, 2023, in person, to see how she was doing. Prior to January 25, 2023, Marano did not attempt to see Sebesta in person. She had conducted a desk review. She conceded that the best practice in performing intake placement exams was an in-person assessment.

¶ 88    Marano recalled that she did not complete an assessment of Sebesta because she was told, via e-mail from Kalfas, that Sebesta was too aggressive to come to the phone. Thus, between the December 13, 2022, unfitness finding and January 25, 2023, Marano did not meet with Sebesta or speak with her on the phone. Marano, however, asked, via e-mail, for biweekly or monthly updates from the jail.

¶ 89    On February 7, 2023, Marano met with the jail's mental health director and learned that the nurse practitioner believed that the medication Sebesta requested was not appropriate, due to side effects. Thus, Sebesta remained unmedicated. Marano had provided no treatment to Sebesta in regard to fitness restoration, but she provided the mental health director with fitness handouts if the director felt that it was appropriate to give them to Sebesta.

¶ 90    On February 24, 2023, the hearing continued. The parties stipulated to the admission of Barczak's testimony from Duncan's case, Coleman's declaration from Barradas-Alvarado's case, and Coleman's testimony from Barradas-Alvarado's case. Further, the parties stipulated to an affidavit by Marano wherein she included updates on Sebesta. Marano averred that she met with

Sebesta in custody on January 25, 2023. She attempted to meet with her again on February 16, 2023, but, when she went to Sebesta's cell, Sebesta yelled and was belligerent. Marano updated the mental health director at the jail and her supervisors. On February 23, 2023, Marano again attempted to meet with Sebesta at the jail. When she went to Sebesta's cell, Sebesta demanded that the interview be recorded and yelled racial slurs and profanities at Marano and threatened Marano's and her family's lives. Marano updated the jail and her supervisors.

¶ 91    Sebesta called Kalfas, who testified that, in mid-December 2022, he transmitted to the Department information concerning Sebesta's case. Further, prior to January 1, 2023, he did not recall informing the Department that Sebesta was too aggressive to even attempt to complete a phone evaluation.

¶ 92    On January 11, 2023, Kalfas received a communication from Marano providing a list of individuals she believed were currently in the jail's custody who were unfit to stand trial. Sebesta's name was *not* on the list. "There were names I had to add to the list." He informed Marano that Sebesta was decompensating while in custody. Marano, according to Kalfas, came in person to the jail on January 25, 2023, and had visited every Thursday since that date.

¶ 93    The trial court found the testimony "astonishing," noting that Sebesta was found unfit on December 13, 2022, but Department personnel did not see her until the court, on January 24, 2023, ordered the Department to do so. Thus, Sebesta, who was presumed innocent, was in jail for 43 days (from the issuance of the rule to the hearing date) without receiving any treatment or transport. The court found the Department in indirect civil contempt of court. It further noted that the Department had not provided a 30-day report because, it found, it "chooses to not follow the statute." The court fined the Department $500 per day until the contempt was purged.

¶ 94 On April 3, 2023, Sebesta was transported to Elgin, and the Department submitted a treatment plan containing an opinion as to the probability of Sebesta attaining fitness within one year. The trial court found that the Department had purged its contumacious conduct and that the total accrued fine was $6500. The Department appeals.

¶ 95                 II. ANALYSIS

¶ 96 The Department argues that the trial court's findings were against the manifest weight of the evidence and that its contempt orders were an abuse of discretion because (1) there was no *prima facie* evidence of noncompliance with the unfitness orders; (2) in determining that defendants established *prima facie* cases of contempt, the court improperly relied, in part, on the Department's purported noncompliance with a statute, rather than a court order; and (3) the evidence did not show a willful and contumacious refusal to obey the unfitness orders. The Department contends that each of the foregoing reasons is a sufficient basis to reverse, and it requests that we vacate the contempt orders. For the following reasons, we find the Department's arguments unavailing.

¶ 97                 A. Statutory Framework

¶ 98 The Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/100-1 *et seq.* (West 2020)) includes procedures for the involuntary commitment of defendants found unfit to stand trial. Its provisions govern proceedings to involuntarily admit those defendants and to determine whether they remain unfit to stand trial. *In re Clarke*, 200 Ill. App. 3d 365, 369 (1990). Under the Code, the court retains "supervisory jurisdiction" to monitor an unfit defendant's commitment and treatment. See *People v. Lavold*, 262 Ill. App. 3d 984, 990 (1994) (discussing the period during which a pretrial detainee may be held pursuant to this jurisdiction without a separate finding that he or she is subject to civil commitment). Specifically, section 104-16(d) of the Code provides

that, upon finding a defendant not fit to stand trial but likely to become fit within one year, the court must order the defendant to undergo treatment to render him or her fit to stand trial. 725 ILCS 5/104-16(d) (West 2020).

¶ 99 At the time of the proceedings, section 104-17(b) provided, in relevant part:

"If the defendant's disability is mental, the court may order him [or her] placed for treatment in the custody of the Department ***. If the court orders the defendant placed in the custody of the [Department], the Department shall evaluate the defendant to determine to which secure facility the defendant shall be transported and, within 20 days of the transmittal by the clerk of the circuit court of the placement court order, notify the sheriff of the designated facility. Upon receipt of that notice, the sheriff shall promptly transport the defendant to the designated facility. If the defendant is placed in the custody of the [Department], the defendant shall be placed in a secure setting. During the period of time required to determine the appropriate placement the defendant shall remain in jail. *** [U]pon completion of the placement process, the sheriff shall be notified and shall transport the defendant to the designated facility. If, within 20 days of the transmittal by the clerk of the circuit court of the placement court order, the Department fails to notify the sheriff of the identity of the facility to which the defendant shall be transported, the sheriff shall contact a designated person within the Department to inquire about when a placement will become available at the designated facility and bed availability at other facilities. If, within 20 days of the transmittal by the clerk of the circuit court of the placement court order, the Department fails to notify the sheriff of the identity of the facility to which the defendant shall be transported, the sheriff shall notify the Department of its intent to transfer the defendant to the nearest secure mental health facility operated by the Department and

inquire as to the status of the placement evaluation and availability for admission to such facility operated by the Department by contacting a designated person within the Department. The Department shall respond to the sheriff within 2 business days of the notice and inquiry by the sheriff seeking the transfer and the Department shall provide the sheriff with the status of the evaluation, information on bed and placement availability, and an estimated date of admission for the defendant and any changes to that estimated date of admission. If the Department notifies the sheriff during the 2 business day period of a facility operated by the Department with placement availability, the sheriff shall promptly transport the defendant to that facility. The placement may be ordered either on an inpatient or an outpatient basis." *Id.* § 104-17(b).[1]

¶ 100     At the time relevant to these appeals,[2] section 104-17(e) provided, in relevant part:

_____

[1]Effective January 18, 2023, section 104-17(b) provides that the Department "shall admit the defendant to a secure facility within 60 days of the transmittal of the court's placement order, unless the Department can demonstrate good faith efforts at placement and a lack of bed and placement availability." 725 ILCS 5/104-17(b) (West 2022). If placement cannot be made and the Department has shown good faith efforts at placement and a lack of bed and placement availability, it must provide updates to the court every 30 days until the defendant is placed. *Id.* The parties and the trial court agreed that the amended version of section 104-17(b) did not retroactively apply in these cases.

[2]Effective January 18, 2023, section 104-17(e) provides that the Department must file the report within 30 days of admission to the designated facility. Pub. Act 102-1118 (eff. Jan. 18, 2023). The parties and the trial court agreed that the amended version of section 104-17(e) did not

"Within 30 days of entry of an order to undergo treatment, the person supervising the defendant's treatment shall file with the court, the State, and the defense a report assessing the facility's or program's capacity to provide appropriate treatment for the defendant and indicating his [or her] opinion as to the probability of the defendant's attaining fitness within a period of time from the date of the finding of unfitness. For a defendant charged with a felony, the period of time shall be one year. *** If the report indicates that there is a substantial probability that the defendant will attain fitness within the time period, the treatment supervisor shall also file a treatment plan which shall include:

> (1) A diagnosis of the defendant's disability;

> (2) A description of treatment goals with respect to rendering the defendant fit, a specification of the proposed treatment modalities, and an estimated timetable for attainment of the goals;

> (3) An identification of the person in charge of supervising the defendant's treatment." *Id.* § 104-17(e).

¶ 101   Section 104-18 provides that the treatment supervisor must file regular progress reports, including an opinion regarding whether the defendant is likely to attain fitness within the prescribed period. *Id.* § 104-18(a).

¶ 102   Section 104-20(a) requires the court to hold hearings every 90 days to determine if the defendant is still unfit to stand trial and, if so, whether the defendant is likely to attain fitness within one year. *Id.* § 104-20(a). If the court finds that the defendant is still unfit to stand trial but is

---

retroactively apply in these cases.

making progress in treatment toward becoming fit, the court may continue or modify its original treatment order. *Id.* § 104-20(c).

¶ 103                         B. Contempt Proceedings

¶ 104   Courts typically enforce orders by way of contempt proceedings. *Computer Teaching Corp. v. Courseware Applications, Inc.*, 191 Ill. App. 3d 203, 206 (1989). A petition for a rule to show cause is the method by which a party seeks enforcement of a court order, by bringing to the court's attention the opposing party's alleged violation of that order. *In re Marriage of LaTour*, 241 Ill. App. 3d 500, 508 (1993).

¶ 105   Contempt may be either civil or criminal, and either direct or indirect, with varying due process requirements depending on the classification. See *People v. Javaras*, 51 Ill. 2d 296, 299 (1972). Whether contempt is civil or criminal turns on the purpose of the contempt charge. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). Criminal contempt is used to punish past contumacious conduct, including "an act committed against the majesty of the law in disrespect of the court or its process" (*Pryweller v. Pryweller*, 218 Ill. App. 3d 619, 629 (1991)), whereas civil contempt is used as a means to compel compliance with a court order, usually "for the benefit or advantage of another party to the proceeding" (*id.* at 628). *Betts*, 200 Ill. App. 3d at 43. "Civil contempt proceedings have two fundamental attributes: (1) [t]he contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order." *Id.* at 44.

¶ 106   Contempt, whether civil or criminal, may be direct or indirect. The distinction between direct and indirect contempt largely depends on where the contumacious conduct took place. See *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 41 (2010). Direct contempt occurs in the judge's presence or in an "integral or constituent part of the court." *Betts*, 200 Ill. App. 3d at 47-48. All other

contempt is indirect and includes all contempt that does not occur in such proximity to a court; it "must be established by the presentation of evidence." *Wierzbicki v. Gleason*, 388 Ill. App. 3d 921, 934 (2009). "A finding of indirect civil contempt relies on the existence of a court order and willful disobedience of that court order." *Sinkus v. BTE Consulting*, 2017 IL App (1st) 152135, ¶ 29.

¶ 107    Because a judge in indirect contempt proceeding does not have personal knowledge of the allegedly contumacious conduct, the contemnor cannot be punished summarily. *Pryweller*, 218 Ill. App. 3d at 629-30. Rather, due process requires that the contemnor receive (1) an evidentiary hearing and (2) adequate notice of the time and place of such hearing. *Id.* at 629.

¶ 108    The petition for a rule to show cause and the rule to show cause work in concert to notify the alleged contemnor of the charges against him or her and the time and place of an evidentiary hearing. *LaTour*, 241 Ill. App. 3d at 508. A party's petition for a rule to show cause typically initiates civil contempt proceedings, but the court must also issue a rule to show cause to satisfy notice requirements. *Id.* The rule to show cause is "the method by which the court brings the parties before it for a hearing"; it is not itself a contempt finding. *Id.*

> "Initially, the burden falls on the petitioner in a rule to show cause to establish, by a preponderance of the evidence, that the alleged contemnor violated a court order and, therefore, should be held in contempt. *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50. 'Noncompliance with a court order is *prima facie* evidence of contempt.' *In re Marriage of Ray*, 2014 IL App (4th) 130326, ¶ 15. Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order. *Knoll*, 2016 IL App (1st) 152494, ¶ 50. 'Contumacious conduct consists of conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or

lessening the authority and dignity of the court.' (Internal quotation marks omitted.) [*Id.*]"

*In re J.S.*, 2022 IL App (1st) 220083, ¶ 72.

¶ 109   "A valid purge condition is a necessary part of an indirect civil contempt order, and '[a] contemnor must be able to purge the civil contempt by doing that which the court has ordered him [or her] to do.' *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007)." *Id.* ¶ 71. However, the inability defense may not be asserted where the contemnor has voluntarily created the incapacity. *County of Cook v. Lloyd A. Fry Roofing Co.*, 59 Ill. 2d 131, 137 (1974).

¶ 110   Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50. A decision is against the manifest weight of the evidence where the court's findings are unreasonable. *Id.* Similarly, a ruling constitutes an abuse of discretion where the court's ruling is unreasonable. *People v. Cerda*, 2014 IL App (1st) 120484, ¶ 183.

¶ 111                    C. *Prima Facie* Cases of Contempt—Lack of Time Frame

¶ 112   First, the Department argues that the trial court erred in finding that defendants established *prima facie* cases of indirect civil contempt.

¶ 113   Preliminarily, citing the trial court orders issuing the rules to show cause, defendants respond that the record on appeal does not contain transcripts of the hearings on defendants' petitions. At each of these hearings, the court considered the petition, heard counsel's arguments, and issued a rule to show cause. Defendants argue that, given that it is the appellant's burden to present a sufficiently complete record on appeal but the Department has failed to include all relevant transcripts, any doubts arising from the incompleteness of the record should be resolved against it (*Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)) and the court's decision should be

affirmed. See *In re Marriage of Ray*, 2014 IL App (4th) 130326, ¶ 17 (presumption of *prima facie* case of contempt where there was no transcript of the hearing).

¶ 114   The Department responds by noting that the issuance of a rule to show cause merely initiates contempt proceedings and does not constitute a finding on the merits that there was *prima facie* evidence of noncompliance with a court order. Thus, it contends, the transcripts of the proceedings that led to the issuance of the rules to show cause are irrelevant to assessing the court's findings made at the merits hearings on the rules to show cause.

¶ 115   We agree with the Department. In *LaTour*, 241 Ill. App. 3d at 508, the court explained the civil contempt process:

"A petition for a rule to show cause is the method for notifying the court that a court order may have been violated, and the petitioner requests a hearing on the issue. The petition for a rule to show cause and the rule to show cause operate together to inform the alleged contemnor of the allegations against [him or] her. The rule to show cause is the method by which the court brings the parties before it for a hearing. It also notifies the alleged contemnor of the time and place of the hearing. Thus, the petition for a rule to show cause initiates the contempt proceedings, but it does not establish that a violation of a court order has in fact occurred. The rule to show cause, issued by the court, is not a finding a violation of a court order has occurred, but part of the process of notifying the alleged contemnor of the charges, and time and place of the hearing. At the *hearing*, the burden is on the petitioner to show a violation of a court order has occurred. Once this showing has been made, the burden shifts to the alleged contemnor to show the violation was not wil[l]ful." (Emphasis added.)

¶ 116 Here, the transcripts from the hearings on the merits are contained in the record on appeal. Specifically, the record contains transcripts of the hearings that led to the court's *prima facie* findings, along with its willfulness determinations.

¶ 117 Turning to the Department's argument, it contends that the court's findings of *prima facie* evidence of noncompliance were erroneous because the court's orders did not each set a specific time frame for it to place or treat defendants. The court, it notes, ordered that each defendant be transported to and placed in the Department's custody, with the Department determining the appropriate placement and providing appropriate treatment. The 30-day deadline, the Department contends, was a reporting requirement. The orders, in its view, contained no language requiring that defendants be placed and treated by a specific date. Thus, the court's findings that defendants established *prima facie* cases of contempt were against the manifest weight of the evidence because contempt must be found on an unambiguous order. See *In re Marriage of Baumgartner*, 2014 IL App (1st) 120552, ¶ 64. The Department reasons that, because the incorrect factual findings were based on an error of law, the court's contempt orders also constituted an abuse of discretion.

¶ 118 We reject the Department's argument. Noncompliance with a court order is *prima facie* evidence of indirect civil contempt. *In re Marriage of Dall*, 212 Ill. App. 3d 85, 97 (1991) (child support order). In Duncan's case, for example,[3] on November 15, 2022, upon finding Duncan unfit to stand trial, the court ordered the sheriff to transport Duncan to and place her in the custody of the Department and ordered the Department to determine the appropriate placement and the

---

[3]With the exception of case names, case numbers, and dates, identical form orders were used for each defendant.

appropriate treatment for her. The court also ordered the Department, within 30 days, to "indicate an opinion as to the probability of [Duncan] attaining fitness within a period of one (1) year from today's date." Further, if there was a probability that Duncan would attain fitness within one year, the Department "shall [ ] file a treatment plan." On December 2, 2022, the Department notified the court that a preplacement evaluation was completed on November 30, 2022, and the results suggested that Duncan remained unfit to stand trial and that Elgin was the most appropriate inpatient setting for a formal assessment. The Department stated that it would notify the sheriff of admissions availability and coordinate Duncan's transfer. At that time, a clinical opinion and treatment plan would be rendered and reported to the court. On December 20, 2022, Duncan petitioned for a rule to show cause because she had not, as of the date of her petition, been transported to a Department facility for treatment.

¶ 119 The court's November 15, 2022, order unambiguously ordered the Department to (1) determine appropriate placement for Duncan and "provide appropriate treatment"; (2) within 30 days, render an opinion as to the probability of Duncan attaining fitness within one year; and, (3) if a probability existed that Duncan would attain fitness within one year, also file a treatment plan. The court also ordered the Department to file a progress report at least seven days before a status hearing set for December 20, 2022. The Department filed with the court, on December 2, 2022, a report indicating that it had conducted a preplacement evaluation on Duncan and determined that she remained unfit to stand trial; that Elgin was the most appropriate placement for a formal assessment; that, upon availability, it would have Duncan transferred there; and that, upon admission, it would conduct a formal assessment and render to the court a treatment plan. On December 20, 2022, when Duncan filed her petition, the Department had not provided Duncan any treatment, opined as to the probability of her attaining fitness within one year, or filed a

treatment plan. Indeed, on December 2, 2022, the Department notified the court that it would *not* formally assess Duncan or file a treatment plan until Duncan was admitted to Elgin, thereby conceding that it would not provide her any treatment until a later date. By the time of the evidentiary hearing on Duncan's petition on January 27, 2023, the Department had still not met its obligations. Similar scenarios played out as to the other defendants.

¶ 120    The Department's assertion that it was not required to provide treatment by a certain date because that date was not specified in the court's order is not well taken. In November 2022, the court ordered the Department to treat Duncan and, within 30 days of its order, to file a treatment plan if it determined that it was likely that she could be restored to fitness within one year. This indisputably shows that the court intended Duncan's treatment to commence nearly immediately after it entered its order. Otherwise, there would be no need to add that a treatment plan be filed within one month of the court's unfitness finding. The Department did not treat Duncan and, instead, merely conducted a preplacement evaluation and affirmatively stated that it would *not* provide a clinical opinion and treatment plan until Duncan was taken into its custody and formally evaluated. This did not occur until February 2023.

¶ 121    *In re Marriage of Baumgartner*, 2014 IL App (1st) 120552, upon which the Department relies, is distinguishable because that case involved indirect criminal contempt, which implicates certain constitutional requirements. Criminal contempt is used to punish past contumacious conduct, including "an act committed against the majesty of the law in disrespect of the court or its process" (*Pryweller*, 218 Ill. App. 3d at 629), whereas civil contempt is used as a means to compel compliance with a court order, usually "for the benefit or advantage of another party to the proceeding" (*id.* at 628). "To be found in indirect criminal contempt requires '(1) the existence of a clear court order, and (2) the willful violation of that order.' " *Baumgartner*, 2014 IL App (1st)

120552, ¶ 60. Further, "[t]o satisfy the first element, the would-be contemnor must have received fair and precise notice of what the order prohibited." *Id.*; see also *Betts*, 200 Ill. App. 3d at 58 ("Indirect criminal contempt proceedings must generally conform to the same constitutionally mandated procedural requirements as other criminal proceedings. One charged with indirect criminal contempt is entitled to *** know the nature of the charge against him [or her], to have it definitely and specifically set forth by citation or rule to show cause, and *** [have] an opportunity to answer ***." (Internal quotation marks omitted.)). The Department cites no authority requiring such exacting requirements in indirect civil contempt proceedings.

¶ 122 *In re Marriage of Vickers*, 2022 IL App (5th) 200164, another case upon which the Department relies, is also distinguishable. In *Vickers*, an indirect civil contempt case, the court noted generally that orders must be unambiguous and that the court's order in that case, which required the parties to communicate via text message or e-mail, did not unambiguously require each parent to provide the other with his or her cell phone number. *Id.* ¶¶ 64-67. *Vickers* is not helpful to our analysis because the trial court here unambiguously required the Department to provide treatment, which the Department did not do. The Department's argument that no time frame was specified for providing treatment fails because the court ordered treatment, which implies, along with the statutory timelines, that it be provided upon or near to the time of the court's order. Undisputedly, timeliness was essential.

¶ 123 In summary, the trial court did not err in finding that defendants established *prima facie* cases for indirect civil contempt.

¶ 124          D. *Prima Facie* Cases of Contempt—Noncompliance With Statute

¶ 125 Next, the Department argues that the court's reliance, in part, on the Department's purported noncompliance with a statute (as opposed to a court order) rendered its *prima facie*

contempt findings an abuse of discretion. This constituted, it asserts, a misapplication of the law because proof of willful disobedience of a court order is necessary for an indirect civil contempt finding.

¶ 126   The Department notes that, as to each defendant, the trial court determined, in part, that the agency did not follow statutory requirements—specifically, section 104-17(e) of the Code. 725 ILCS 5/104-17(e) (West 2020) (requiring, within 30 days of unfitness order, opinion as to probability of the felony defendant attaining fitness within one year and, if there was such a probability, filing a treatment plan). Conceding that, if the underlying orders incorporated the statutory requirement, then contempt findings could be used to enforce them, the Department argues that, although the trial court's unfitness orders did not explicitly incorporate any of the statutory requirements, they did independently require that the Department file a report within 30 days. The Department concedes that the court did not state that its analysis was informed *only* by the statute's requirements; but, the Department argues, it explicitly based its findings, *in part*, on noncompliance with the statute.

¶ 127   We reject the Department's argument. The trial court's findings were based primarily on its determination that the Department had not complied with its orders and partly on its findings that the Department had not complied with the statute. For example, in the Weinstein case, the trial court issued the rule on January 10, 2023, finding that the Department had neglected to comply with the statute and the court's unfitness order. Later, in finding that Weinstein had established a *prima facie* case, the court noted that its unfitness order had directed the Department to provide Weinstein treatment and that the statute required the agency to file a 30-day report, none of which were completed. Subsequently, in finding the Department in indirect civil contempt, the court found that the agency had failed to follow its unfitness order directing the Department to treat

Weinstein and further found that the violation was willful and contumacious. The court also referenced the statute, noting its interpretation that the statute required a defendant to undergo treatment within 30 days.

¶ 128    As noted, apart from case names, case numbers, and dates, the court's unfitness orders were identical form orders for all defendants. They required that defendants be placed in the Department's custody and that the Department provide treatment and, within 30 days, provide an opinion as to whether the defendants could attain fitness within one year; if so, the agency was to file a treatment plan. Thus, the orders mirrored the statutory language. Section 104-17(b) of the Code provides that, if a defendant's disability is mental, the court may order him or her placed for treatment in the Department's custody. *Id.* § 104-17(b). Further, section 104-17(e) of the Code requires the Department, within 30 days of an order directing treatment,[4] to file a report indicating its opinion as to the probability of the defendant attaining fitness within one year and, if there is such a probability, to file a treatment plan. *Id.* § 104-17(e). Administrative agencies are creatures of statute and have no general or common-law powers. *Goral v. Dart*, 2020 IL 125085, ¶ 33. Their powers are limited to those granted by the legislature, and any actions they take must be authorized by their enabling statutes. *Id.* The trial court did not err in referencing the statutory requirements, but it ultimately and primarily ruled that the Department had not complied with its unfitness orders.

¶ 129                     E. Willful and Contumacious Conduct

---

[4]Currently, the statute provides that the section 104-17(e) report be filed "[w]ithin 30 days of admission to the designated facility" (725 ILCS 5/104-17(e) (West 2022)), rather than within 30 days of the entry of the unfitness order directing treatment of the defendant.

¶ 130 The Department's final argument is that, even if defendants established *prima facie* cases of indirect civil contempt, the evidence did not show that the Department engaged in willful and contumacious conduct. It contends that factors outside its control prevented it from placing and treating defendants; its efforts, though unsuccessful, demonstrated that its noncompliance with the unfitness orders was not willful. The Department further contends that the court abused its discretion by relying, in part, on Department conduct that predated the unfitness orders.

¶ 131 "Contumacious conduct consists of 'conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court.' " *In re Marriage of Charous*, 368 Ill. App. 3d 99, 108 (2006) (quoting *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 349 (1992)).

¶ 132 The Department first takes issue with the trial court's finding that the agency did not dedicate sufficient resources to hiring, expanding facilities, and providing treatment in the county jails. It asserts that the evidence demonstrates that the opposite conclusion is clearly evident: the delay in placing and treating defendants was due to circumstances outside its control. The evidence, the Department contends, showed that its facilities were at full capacity and that a defendant could be admitted only if a current patient was discharged. Also, there were limited opportunities for community placement, which restricted the agency's ability to free up beds for new admissions. Department personnel testified, it notes, about nationwide staff shortages that prevented the Department from operating inpatient treatment at full capacity and further expanding facility capacity. Also, it raised starting salaries and still had difficulty hiring staff, and, in recent years, the number of court-ordered referrals for inpatient treatment had dramatically increased. As for jail-based treatment, the Department notes, Coleman explained that the Department lacked resources to provide comprehensive psychiatric services both within its facilities and at every

county jail. The Department contends that no contrary evidence was presented and, thus, the court did not have to weigh competing evidence.

¶ 133   Relatedly, the Department contends that, although its efforts to place and treat defendants were unsuccessful, they did not demonstrate willfulness. The court, it argues, improperly focused on the *effectiveness* of the Department's efforts rather than on whether the *efforts* demonstrated a lack of intent to comply with the court's unfitness orders. Its efforts and placement must be assessed, it urges, in the context of the systemic obstacles it faced. The Department notes that it employed several methods to assess and track defendants' mental health, including preplacement evaluations, Marano's monthly e-mail checks between November 2022 and late January 2023, her in-person visits beginning in late January 2023 (every Thursday and sometimes on Tuesdays), and her increased communications with the jail's mental health staff (which helped identify defendants who needed higher placement prioritization). All of these efforts, the Department asserts, were intended to create faster compliance with the court's orders and do not demonstrate willfulness. The Department also takes issue with the court's assessment that it could have implemented treatment and placement procedures that the court believed would have been better or more efficient. It argues that this did not demonstrate willfulness. Its efforts, it contends, were focused on complying with the unfitness orders.

¶ 134   The Department relies on *In re J.S.*, 2022 IL App (1st) 220083, ¶¶ 78, 87, where the reviewing court reversed or vacated indirect civil contempt orders in several cases brought by the public guardian against the Department of Children and Family Services (DCFS) for failing to find appropriate placements for minors in either residential treatment centers or specialized foster homes. In each of the cases, DCFS found facilities for potential placement for the minors, but the facilities were not controlled by DCFS and the minors were rejected for placement for various

reasons. The trial court found DCFS in indirect civil contempt for failing to place the minors by a certain date and, in some of the cases, also found that DCFS ignored the court's orders. In one case, the trial court found that DCFS's systemic issues affected minors throughout the State (referencing 150 minors statewide in residential facilities being held beyond their discharge date and 50 minors hospitalized beyond medical necessity) but noting that the specific reason it found DCFS in contempt was the agency's failure to comply with its orders to find appropriate placements for the minors.

¶ 135 The reviewing court held that, although the agency's efforts were ineffective, it was actively engaged in trying to find appropriate placements and did not ignore the trial court's orders; thus, the contempt orders were an abuse of discretion. *Id.* ¶¶ 78-79, 83. The trial court, it determined, failed to address the agency's ability to comply with the court's orders, given the complexity of the cases, availability of resources, and the court's time parameters. *Id.* ¶ 79. Further, the reviewing court took issue with the trial court's comments regarding DCFS activity *before* the court's placement orders were entered, noting that the conduct could not be considered in a civil contempt proceeding. *Id.* ¶ 81.

¶ 136 Here, the Department argues that there should be a similar result as in *J.S.* It maintains that it engaged in efforts that, although unsuccessful, were taken to comply with the unfitness orders: it evaluated defendants, identified appropriate placements, monitored defendants' conditions through e-mail and in-person communication with jail personnel, and updated each defendant's priority on the waiting list based on their current mental health needs. Further, it argues that, as in *J.S.*, factors outside its control—insufficient staff and beds and increased referrals—delayed its ability to place and treat defendants as required by the unfitness orders. Finally, the Department contends that the fact that it controls its own facilities, unlike DCFS, is not dispositive of the

underlying questions to establish willfulness—whether it engaged in efforts to comply and compliance was impossible due to factors outside its control.

¶ 137    We reject the Department's arguments. The issue is whether the court erred in determining that the Department did not meet its burden to show that its violations were not willful and contumacious and that it had a valid excuse for failing to follow the court's orders. As noted, a contemnor must be *able* to purge a civil contempt by doing what the court has ordered it to do. *Id.* ¶ 71. However, the contemnor cannot claim inability to purge where it has *voluntarily* created the incapacity. *Lloyd A. Fry Roofing*, 59 Ill. 2d at 137.

¶ 138    The Department, as testified to by Barczak in Duncan's case, has a policy that it will conduct a full evaluation of a defendant (presumably, a prerequisite to any substantial treatment) only after the defendant is in custody at one of its facilities. Notwithstanding this self-imposed limitation, the evidence reasonably showed that the Department essentially failed to even monitor and/or track defendants at the jail. This policy also resulted in Department staff relying on jail personnel who had no mental health training to provide updates to staff concerning defendants. Barczak testified in Duncan's case that Marano conducted all preplacement evaluations via telephone calls to Kalfas, who is not a mental health professional and does not consult with jail mental health staff (although Kalfas disputed this latter point but also testified that no one at the Department communicates with jail mental health staff). Indeed, Marano, who conceded that in-person visits were the superior way to conduct preplacement evaluations, testified, in Weinstein's case, that she began visiting the jail in person only after Barczak contacted her after hearings on January 24, 2023, and instructed her to go to the jail to see everyone who was still unfit to stand trial. (She agreed, in Barradas-Alvarado's case, that she was never prevented from visiting the

jail.) Barczak also testified, in Duncan's case, that it was *unacceptable* that Marano was conducting preplacement evaluations over the telephone for most Lake County cases.

¶ 139   Sebesta's case is perhaps the most egregious, as her case initially appeared to fall through the cracks. According to Kalfas, as of January 11, 2023, Sebesta—who had been found unfit on December 13, 2022—was not even on Marano's list of jail inmates unfit to stand trial, and Kalfas informed Marano of this and that Sebesta was decompensating. Thus, for nearly one month after the unfitness order, Sebesta was nowhere on the Department's radar. Marano met with Sebesta on January 25, 2023, the date, according to Kalfas, that Marano began regularly coming to the jail. For the Department to claim that it was making efforts to comply with the court's orders is, therefore, wholly inaccurate and mischaracterizes the nature of the Department's actions.

¶ 140   In Weinstein's case, as defendants note, the Department called only one witness— Marano—who testified that Weinstein—who was found unfit on November 22, 2022—had not received any treatment. She saw Weinstein in person for the first time on January 25, 2023, six days before the hearing on the rule. Even after visiting Weinstein in person, Marano did not assess him for a recommendation to a facility or write a report on her findings.

¶ 141   Clark was found unfit on December 20, 2022, and Smith was the initial evaluator, being assigned to his case from December 22, 2022, through January 4, 2023, or 13 days. Smith attempted to conduct a preplacement evaluation via telephone on December 28, but Clark was not cooperative. Thereafter, she did not attempt to contact the jail for updates concerning his status. Marano was assigned to Clark's case, on January 5, 2023, but she did not visit him at the jail until January 25, 2023, 20 days later.

¶ 142   Barradas-Alvarado was found unfit on November 8, 2022. Marano testified that she merely conducted a desk review on November 10, 2022, and communicated with Kalfas, who was not a

mental health professional, about Barradas-Alvarado. (Contrary to this testimony, Coleman testified that the Department interviewed Barradas-Alvarado over the telephone.) The next contact that Marano had with Clark was not until January 25, 2023, when she met him in person at his cell front. She provided no treatment. Similarly, Duncan was found unfit on November 15, 2022, and Marano did not see her in person for nearly two weeks after being informed on January 11, 2023, that she was exhibiting behavioral issues.

¶ 143   The evidence concerning jail-based treatment also showed that the Department's conduct was willful and contumacious. Coleman stated that it is clinically not possible or prudent to attempt fitness restoration in terms of didactic education for someone who is psychiatrically ill. However, she also testified that the Department was currently considering pilot programs and looking at funding services in the jails, which may include elements of jail-based restoration. Further, Marano testified that she provides fitness educational pamphlets to certain jails but does not provide such materials to Lake County inmates (with the exception of leaving fitness handouts with the jail's mental health director for Sebesta). Based on this evidence, the trial court reasonably determined that the Department voluntarily chose to not attempt restoration at the Lake County jail.

¶ 144   Thus, focusing on the periods after the trial court's unfitness orders, the evidence reasonably showed that the Department failed to engage in efforts to comply with the court's unfitness orders.

¶ 145   We also find unavailing the Department's claims that factors outside its control prevented it from placing and treating defendants. Coleman's declaration and testimony related recent efforts—many of which predated the court's fitness orders—that the Department had engaged in to address the issues related to increases in referrals to its facilities and staffing shortages; these efforts included recruiting, increasing salaries for certain entry-level positions, and expanding

forensic capacity (including partnerships with private hospitals and capital improvements at an unused Department building. However, Coleman also related that funding was not an issue, stating that the Secretary of Human Services and the Governor's offices were "affording all resources to this." Thus, the Department, which has full control over staffing, placement, and treatment decisions, unlike DCFS in *J.S.*, cannot reasonably claim that factors beyond its control precluded it from complying with the court's unfitness orders.

¶ 146    Coleman testified that, prior to the pandemic, the Department and the jail explored conducting jail-based restoration but abandoned the plan. And, again, she explained that the Department did not have the resources to provide treatment in the jail and described the challenges in providing jail-based treatment. However, she also claimed that there were no budgetary constraints and that the Department was currently exploring jail-based options. It is reasonable to conclude from this evidence that the lack of some level of jail-based restoration services was a voluntary decision by the Department.

¶ 147    Finally, the Department argues that the trial court erred in relying, in part, on Department conduct that predated the unfitness orders. Specifically, it notes the court's reliance on the agency's unsuccessful efforts several years ago to establish jail-based restoration services and the waiting list, understaffing, insufficient space, and other issues that have existed for at least a decade prior to the pandemic. The court, it further notes, also partly based its findings on the use of phone interviews and desk reviews and on the lack of in-person visits starting in July 2022. The Department contends that its conduct predating the unfitness orders cannot be considered in establishing willfulness; thus, it concludes, the court erred as a matter of law by relying on these extrinsic facts in finding the agency's conduct willful, thereby, further rendering the findings an abuse of discretion.

¶ 148 We reject the Department's claim. The trial court did not primarily rely on the Department's conduct that predated the unfitness orders. To the extent that the court relied on this conduct, it did so to clarify the context of the Department's actions. The Department points to references the court made as examples of willfulness; in Barradas-Alvarado's case, the court referred to the fact that the agency had abandoned a jail-based restoration program years earlier. It also referenced jail-based treatment in Clark's case. But this history provided context for the agency's current efforts. Specifically, as noted, Coleman testified that the Department was currently considering pilot programs and looking at funding and providing services directly in the jails, noting that this may include elements of jail-based restoration. In another example, the Department points to the trial court's reference, in Sebesta's case, to the years-long issues with waiting lists and, again, a reference to jail-based restoration. The court's reference to waiting lists included mentioning Coleman's testimony that about 20 beds had *recently* been added (in late November 2022 and again in early January 2023) at Elgin, during a period that did not predate the unfitness orders. Finally, we note that the Department *itself* references its historical staffing, capacity, referral, and waiting list issues. In sum, the Department's systemic issues and actions taken before the unfitness orders were not the primary drivers of the court's determination that the Department's failure to comply with the orders was willful and contumacious.

¶ 149                                         III. CONCLUSION

¶ 150 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 151 Affirmed.

---

## *People v. Weinstein*, 2024 IL App (2d) 230062

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, Nos. 22-CC-2, 22-CF-1808, 22-CF-1438, 22-CF-1876, 22-CF-950, 22-DV-463; the Hon. Paul B. Novak, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Benjamin F. Jacobson, Assistant Attorney General, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | John W. Radosevich, Katherine A. McCollum, of Del Re Law Group, P.C., of Waukegan, for appellees. |
| | David S. Friedland and Edward R. Psenicka, State's Attorneys Appellate Prosecutor's Office, of Elgin, for the People. |

---