NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241147-U

NO. 4-24-1147

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 25, 2025
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* ESTATE OF SEAN M. SUTHERLAND, Deceased, | ) Appeal from the |
| | ) Circuit Court of |
| | ) Mason County |
| (Ginny M. Showalter, | ) No. 23PR26 |
|     Respondent-Appellant, | ) |
|       v. | ) Honorable |
| | ) Roger B. Thomson, |
| Travis Sutherland, | ) Judge Presiding. |
|     Petitioner-Appellee). | |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the trial court's order (1) holding respondent in indirect civil contempt and (2) directing her to return property to the Estate.

¶ 2    In May 2023, Sean M. Sutherland died intestate in Bath, Illinois. His son, Travis Sutherland, was appointed administrator of Sean's estate (Estate). At the time of his death, Sean was living with his fiancée, Ginny M. Showalter, who retained possession of much of Sean's property after his death, including numerous personal effects and a white GMC truck.

¶ 3    In August 2023, the Estate filed a petition for a citation to recover assets from Ginny. In September 2023, the trial court entered an agreed order directing Ginny to turn over to the Estate Sean's property, except for the truck, the ownership of which was in dispute. In February 2024, the court held Ginny in indirect civil contempt for failing to comply with that order. In April 2024, the court found that the truck was an asset of the Estate and ordered Ginny to turn it over to

the Estate. Subsequently, Ginny filed a motion to reconsider, which the court denied.

¶ 4 Ginny appeals, arguing that (1) she was denied her right to due process because the trial court was biased against her, (2) the trial court erred by finding her in indirect civil contempt of court, and (3) the trial court erred by granting the Estate's petition for a citation to recover assets. We disagree and affirm.

¶ 5 I. BACKGROUND

¶ 6 In May 2023, Sean died intestate in Bath, Illinois. In June 2023, Sean's son, Travis, filed a petition for letters of administration, which the trial court granted, appointing him the independent administrator of the Estate.

¶ 7 In August 2023, the estate filed a petition for citation to recover assets against Ginny. The petition alleged that (1) Ginny and Sean lived together at the time of his death and (2) she had not turned over Sean's property to the Estate, which included, among other things, a 2007 white GMC truck.

¶ 8 In September 2023, the trial court entered an agreed order (1) continuing the citation proceedings to November 2023 and (2) requiring Ginny to turn over, by November 13, 2023, Sean's personal belongings that she had in her possession, including clothing, guns, a wallet, license plates, a Honda generator, jewelry, and family photos and albums. Because the parties disputed ownership of the truck, they agreed to continue the request to turn it over to a later date.

¶ 9 In October 2023, the trial court entered another agreed order, noting that the parties agreed that "the signature of the decedent, Sean Sutherland, is at issue in the Petitions, and unredacted signatures are essential to resolving the evidentiary issues presented." Accordingly, the court ordered that the Office of the Secretary of State provide copies of the GMC truck's title documents and transfer documents containing unredacted signatures.

¶ 10          In November 2023, the trial court entered an agreed order, again continuing the citation proceedings for the secretary of state to comply with the subpoena. Later in November 2023, the Estate filed a petition for a rule to show cause, in which it alleged that, on November 13, 2023, Travis appeared at Ginny's home with a Mason County sheriff's deputy to retrieve the items listed in the agreed order. Ginny refused to comply with the order and failed to turn over any belongings or any other documents to the Estate.

¶ 11          The Estate asked the trial court to hold Ginny in contempt of court and enter an order requiring her to (1) comply with the agreed order, (2) pay attorney fees and costs, and (3) "serve no less than thirty (30) days in the Mason County Jail *** with the Order being stayed for a sufficient period of time to allow her to cure the contempt but in no event greater than 7 days."

¶ 12          In December 2023, the trial court entered an order to show cause, requiring Ginny to appear on January 17, 2024, and explain why she should not be held in contempt of court for refusing to comply with the court's order.

¶ 13                              A. The Contempt Hearing

¶ 14          In January 2024, the trial court conducted a hearing on the Estate's petition for a rule to show cause. At the beginning of the hearing, the court noted that the parties had agreed to continue the Estate's petition for a citation to recover assets.

¶ 15                              1. *David Baker*

¶ 16          David Baker, a deputy with the Mason County Sheriff's Office, testified that on November 13, 2023, he accompanied Travis to Ginny's home to retrieve the Estate's property. When they arrived, Ginny was not home. Her daughter, who answered the door, called Ginny on the phone. Over the phone, Ginny told Baker she was not going to release the property until her

next court date. Baker told her that she would be in contempt of court for not complying with the order. Ginny said she did not care.

¶ 17                                    2. *Travis Sutherland*

¶ 18            Travis's testimony was consistent with Baker's description of their attempts to retrieve the property pursuant to the September 2023 order.

¶ 19            Travis further testified that prior to that date, Ginny had given Travis (1) three totes containing Sean's clothing and (2) two of the four guns Sean had owned. Since the order was entered, Travis had no communication from Ginny and he had yet to receive the following items from her: (1) Sean's "day-to-day" clothing (which included Harley-Davidson-branded clothing), (2) the remaining two guns, (3) Sean's wallet and credit cards, and (4) a Honda generator, which Travis had last seen in March 2023 on the front of Sean's camper.

¶ 20            On cross-examination, Travis testified that he saw Sean "two or three times [a year] due to the fact that [he] lived in Chicago." He last saw his Sean's closet "probably" a year and a half before he died. Travis stated that he did receive a garbage bag of clothing before the September 2023 order was entered, which contained "[s]hirts and jeans from probably the day I was born." The totes Ginny had given him also contained "NASCAR memorabilia, [Sean's] dog tags, and a couple other miscellaneous items from over the years, like a hood ornament for his semi that he drove 20 years ago."

¶ 21                                    3. *Andy Clark*

¶ 22            Andy Clark testified that he was Sean's best friend and would see him six or seven times a year. Sean wore "nothing but" Harley Davidson clothing, including T-shirts, tank tops, boots, sweatshirts, and a jacket. He knew that Sean had a Glock 19 handgun because they had gone shooting together with it. Clark also remembered speaking with Sean about him buying an AR-15

rifle, but Clark admitted he never personally saw it. He also remembered seeing Sean wearing a gold necklace. On cross-examination, Clark testified that he had never been to Sean's home in Bath.

¶ 23                                    4. *Ginny Showalter*

¶ 24            Ginny testified that she was Sean's fiancée and that they had been in a relationship for five years and eight months. At the time of his death, they resided together. She had met Clark only once in all that time. When asked what property she had turned over to Travis, she stated that she had given him "three garbage bags of clothes and probably 10 to 15 totes. There was some in the back and there was some in the kitchen and then the garbage bags were on the right hand side when you opened the door." When asked how Travis "transport[ed] that many totes," Ginny explained, "I had put them all in the camper for him and then I took the key to Mike Case, who's the sheriff, and he went down there with Travis as Travis opened it and was going through the items." Thereafter, Travis took the camper.

¶ 25            Ginny further testified about the items listed in the order and generally denied possessing them. She provided various explanations for where she believed some of the items were or when and how Sean got rid of them. For instance, she testified that "[l]iterally the weekend before [Sean's death]," they had gone through their closet and gotten rid of eight garbage bags of clothing and Sean got rid of all the shirts that no longer fit and were much too small. Regarding the guns, Ginny stated Sean only had one AR-15 rifle in their house and she gave it to Travis on the day Sean died. She said the Glock handgun was kept in the saddlebag of a motorcycle that that Travis had taken possession of at Sean's celebration of life ceremony.

¶ 26            On cross-examination, Ginny admitted that since the trial court entered the September 2023 order, she had not turned over any additional items to Travis. Ginny

acknowledged that she had been in court in September 2023 when the agreed order was entered, but she insisted that she and her lawyer had understood that the items listed were ones that (1) she owned personally, (2) had already been turned over to Travis, or (3) she did not have and were going to be discussed later in court. She admitted that she still had some of Sean's clothing, "like seven shirts and maybe two or three pairs of jeans and some wife beaters and boxers."

¶ 27　　　　　The Estate's counsel asked Ginny why she did not turn the clothing over to Travis when he came to her house with the sheriff, and she answered, "I wasn't there." When asked if she said she did not care if she was held in contempt, Ginny testified, "No. I said I don't care, I have to get ahold of my lawyer, which I did within five minutes." Ginny insisted that her lawyer did not tell her to comply with the trial court's order and, instead, told her to get an order of protection, which she did. She agreed to give the clothing and any other items she might still have in her possession to Travis.

¶ 28　　　　　　　　　　　*5. Travis Sutherland (Recalled)*

¶ 29　　　　　In rebuttal, Travis testified that he had received (1) one of two AR-15 rifles that Sean owned and (2) Sean's camper, which contained a garbage bag and "four to five totes".

¶ 30　　　　　　　　　　　*6. The Trial Court's Order*

¶ 31　　　　　In February 2024, the trial court entered a written order, finding Ginny (1) willfully and contumaciously refused to comply with the September 2023 agreed order and (2) in indirect civil contempt for failing to turn over "[Sean's] personal belongings to the Petitioner; including but not limited to clothing, gun, wallet, license plates, Honda generator, family photos, and albums, and Harley Davidson clothing." The court ordered that Ginny (1) appear for a sanctioning hearing on March 20, 2024, (2) comply with the court's order by that date, and (3) pay the reasonable attorney fees and costs incurred by the Estate.

¶ 32                    B. The Citation To Recover Assets Hearing

¶ 33        In March 2024, the trial court conducted a hearing on the Estate's petition for a citation to recover assets, the focus of which was the ownership of the GMC truck. Ginny appeared with counsel and testified that during her relationship with Sean, he owned a white GMC truck. Her name was not on the truck's title during Sean's lifetime, but he had given her the truck before he died.

¶ 34        Ginny explained that, at the time of Sean's death on May 28, 2023, the truck was still registered in his name, but he had signed the title over to her on May 1, 2023. She did not take the title to the Department of Motor Vehicles (DMV) on that date because she did not expect Sean to die. Eventually, she brought the signed title to the DMV on June 23, 2023, to register the truck in her name.

¶ 35        When Ginny was asked what evidence besides the title showed Sean had given her the truck, she responded that she had Facebook messages that Sean sent her nine months before he died, saying that he wanted to give the truck to her as soon as he bought himself a new one. She did not know if her attorney had brought those messages to court, but she said she had copies in her car.

¶ 36        Ginny testified that she had been the primary driver of the truck after Sean had purchased a new truck pursuant to an agreement Sean had made with her daughter—specifically, that Ginny's daughter would purchase her old car and Ginny would then get the GMC truck. However, she acknowledged that the written agreement between Sean and her daughter did not mention Ginny or the truck at all. Ginny testified that she had brought to court clothing that belonged to Sean that she still had, which she had found in her shed in December. All of Sean's other clothes she possessed had already been handed over to the Estate in the camper.

¶ 37    Michael Case testified that he was a deputy sheriff with Mason County. On June 30, 2023, he was assigned to stand by for a property retrieval between Ginny and Travis. He accompanied Travis to a camper, and Travis obtained multiple totes and garbage bags, which took him four or more trips to load into his vehicle.

¶ 38    The Estate offered and the trial court admitted into evidence the testimony of a handwriting expert, whose evidence deposition was taken in February 2024. The expert attested that it "is probable that [Sean] did not write the questioned Sean Sutherland signatures appearing on the two titles." On April 19, 2024, the court found that the truck was an asset of the Estate and ordered Ginny to give the truck, keys, and title to the Estate within seven days.

¶ 39                        C. The Motion To Reconsider

¶ 40    In May 2024, Ginny *pro se* filed a motion to reconsider both the contempt order and the order regarding the truck. She alleged that she did not have many of the items she was ordered to turn over as part of the contempt order. She further alleged that on January 17, 2024, her lawyer agreed to "continue everything but the contempt of court charge" and she did not get to present any witnesses or evidence at the motion to reconsider hearing.

¶ 41    In August 2024, the trial court conducted a hearing on Ginny's motion to reconsider. At that hearing, Ginny appeared *pro se*. The court asked her if she had "returned this truck to the estate," to which she answered, "No."

¶ 42    Ginny then testified that she had evidence of text conversations between her and Sean before his death that were available to her prior to the motion to reconsider hearing, but her attorney did not bring them to court or present them. The Estate objected, arguing that the evidence was inadmissible under the Dead-Man's Act (735 ILCS 5/8-201 *et seq.* (West 2022)) and she could have brought up these conversations before the motion to reconsider hearing. Ginny responded, "I

mean I did mention that [the Estate's attorney] asked me for the documentation. I said, yes, I had it and I had given it to my lawyer, and she didn't have it that day."

¶ 43    The trial court inquired whether Ginny was represented by counsel at that time, and she answered, "Yes." The court then asked if she had anything else to present on her motion to reconsider. She argued, "The Deadman's law says that I can't say things about the conversations we had before [Sean's] death, but documents and conversations proving them, which I do have, can be used." The court then asked, "Okay, anything else?" She said, "No." The court asked her to step down from testifying and whether she had any other evidence, to which she said, "No."

¶ 44    The trial court then denied Ginny's motion to reconsider, stating, "[E]vidence that was available and known to a party that wasn't brought to the court's attention at the time of the trial is not grounds for a motion to reconsider." The court ordered Ginny to return the truck to the Estate that afternoon, or the court would find her in contempt of court. Later that day, she complied and returned the truck to the Estate.

¶ 45    This appeal followed.

¶ 46                                II. ANALYSIS

¶ 47    Ginny appeals, arguing that (1) she was denied her right to due process because the trial court was biased against her, (2) the court erred by finding her in indirect civil contempt of court, and (3) the court erred by granting the Estate's petition for a citation to recover assets. We disagree and affirm.

¶ 48    As an initial matter, we note that the Estate has not filed a brief in this appeal. However, because the record is simple and the issues can be easily decided without the aid of the appellee's brief, we address the merits of Ginny's appeal. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 49                                    A. Judicial Bias

¶ 50        Regarding the issue of judicial bias, Ginny does not cite any evidence in the record supporting her claim that the trial court was biased against her.

¶ 51        A reviewing court is entitled to an appellate brief that presents clearly defined issues and cohesive legal argument, supported by citations to pertinent authority. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring that arguments "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"). Points not developed to the standards of Rule 341(h)(7) are forfeited. *In re Marriage of Turano Solano*, 2019 IL App (2d) 180011, ¶ 70. "Mere contentions, without argument or citation to authority, do not merit consideration on appeal." *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12. "The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument." *Id.*

¶ 52        Accordingly, because Ginny's brief presents no legal argument and no citations to the record, she has forfeited this issue, and we do not address it on appeal.

¶ 53                                 B. Indirect Civil Contempt

¶ 54        Ginny next argues that the trial court erred by finding her in indirect civil contempt because (1) she did not have the items that she was ordered to turn over and (2) the Estate failed to prove that those items existed. We disagree.

¶ 55                            1. *The Applicable Law Regarding Contempt*

¶ 56        It should be noted that in its petition for a rule to show cause, the Estate requested the imposition of jail time as a sanction for Ginny's indirect civil contempt, regardless of whether she complied with the September 2023 agreed order. This request reflects a fundamental misunderstanding by the Estate's counsel regarding the purpose and limitations of civil contempt

orders. Had the trial court granted the Estate's requested jail time as a sanction for indirect civil contempt, we would have been bound to vacate that order. Given counsel's misunderstanding, we clarify the distinct purposes and limitations of civil and criminal contempt.

¶ 57 "Courts typically enforce orders by way of contempt proceedings. [Citation.] A petition for a rule to show cause is the method by which a party seeks enforcement of a court order, by bringing to the court's attention the opposing party's alleged violation of that order." *People v. Weinstein*, 2024 IL App (2d) 230062, ¶ 104. Contempt can be categorized as either civil or criminal, and it may occur directly or indirectly. *Id.* ¶ 105. The distinction between civil and criminal contempt is determined by the purpose of the contempt charge. *Id.*

¶ 58 "Civil contempt is remedial in nature, intended to benefit the complainant by coercing obedience with a court order. [Citation.] Because of its coercive purpose, the sanction or penalty must be designed to compel future compliance with the court's commands." *Door Properties, LLC v. Nahlawi*, 2023 IL App (1st) 230012, ¶ 30. This court has described the distinctive characteristics of civil contempt proceedings as follows:

> "Civil contempt proceedings have two fundamental attributes: (1) The contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order. [Citations.] In other words, the contemnor must have an opportunity to purge himself of contempt by complying with the pertinent court order. If the contempt sanction is incarceration, the respondent's circumstances should be such that he may correctly be viewed as possessing the keys to his cell." (Internal quotation marks omitted.) *In re Marriage of Betts*, 200 Ill. App. 3d 26, 44 (1990).

¶ 59　　　　　Criminal contempt, on the other hand, "is punitive and is imposed to vindicate the authority of the court. [Citation.] Criminal contempt is retrospective in that it seeks to punish a contemnor for past acts that he cannot now undo." (Internal quotation marks omitted.) *Door Properties*, 2023 IL App (1st) 230012, ¶ 40.

¶ 60　　　　　Contempt, whether civil or criminal, may be direct or indirect, depending largely on where the contumacious conduct took place. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 41 (2010). Direct contempt occurs in the judge's presence or in an "integral or constituent part of the court." *Betts*, 200 Ill. App. 3d at 47-48. Indirect contempt includes all contempt that does not occur in such proximity to a court and "must be established by the presentation of evidence." *Wierzbicki v. Gleason*, 388 Ill. App. 3d 921, 934 (2009).

¶ 61　　　　　"Once the party bringing the contempt petition establishes a *prima facie* case of disobedience of a court order, the burden shifts to the alleged contemnor to prove that the failure to comply was not willful or contumacious and that there exists a valid excuse for his failure." *In re Marriage of Harnack*, 2022 IL App (1st) 210143, ¶ 46.

¶ 62　　　　　We review a trial court's contempt order for an abuse of discretion. *Western States Insurance Co. v. O'Hara*, 357 Ill. App. 3d 509, 515 (2005).

¶ 63　　　　　　　　　　　　　　　　2. *This Case*

¶ 64　　　　　Here, Ginny argues that she did not violate the trial court's September 2023 order because (1) she did not have the items that she was ordered to turn over to the Estate and (2) the Estate did not prove that those items existed in the first place. However, Ginny agreed in the September 2023 order to return Sean's property to the Estate, which included his clothing. At the January 2024 contempt hearing, the testimony demonstrated that since the September 2023 order was entered, Ginny had not turned over any additional items of Sean's property to the Estate.

Further, all the testimony showed that she refused to turn over any property when Travis visited her home to enforce the order. She argues on appeal that some of the items did not exist but that assertion is at odds with her testimony at the contempt hearing that she was, at that time, still in possession of several items of Sean's clothing and agreeable to returning whatever items she still possessed. Ginny's admission at the contempt hearing that she had not complied with the trial court's order, coupled with Baker's testimony that she said she did not care if she was held in contempt, supports the court's contempt finding.

¶ 65 "Noncompliance with a court order is *prima facie* evidence of indirect civil contempt." *Weinstein*, 2024 IL App (2d) 230062, ¶ 118. Once the court found that Ginny did not turn over any of the items to the Estate as the trial court directed when it entered the September 2023 *agreed* order, the burden shifted to Ginny to show why she should not be held in contempt for her noncompliance. She failed to do so, and nothing in the record refutes the trial court's finding her in indirect civil contempt for her actions.

¶ 66 In addition, although Ginny does not specifically challenge the trial court's award of attorney fees and costs to the Estate after finding her in contempt, we note that, incidental to its inherent contempt powers, "The court may require a contemptuous party to bear the contempt action's reasonable costs and attorney fees." *Edwards v. Pekin Memorial Hospital*, 2023 IL App (3d) 210005, ¶ 49. Accordingly, we affirm the trial court's contempt order and award of attorney fees and costs.

¶ 67 C. The Petition for a Citation To Recover Assets

¶ 68 Last, Ginny argues that she was denied a fair trial by not being able to present evidence in the form of Facebook messages she had received from Sean to show that he had gifted her the truck before he died. She contends that she was not able to present the messages at the

citation to recover assets hearing because her attorney was not prepared and she was not allowed, subsequently, to present that evidence at the motion to reconsider hearing.

¶ 69    "The purpose of a motion for reconsideration is to appraise a trial court of newly discovered evidence, a change in the law, or errors in the court's application of the law." *Hajicek v. Nauvoo Restoration, Inc.*, 2014 IL App (3d) 121013, ¶ 12. The denial of a motion for reconsideration will not be reversed absent an abuse of discretion. *American National Trust Co. of Chicago v. Kentucky Fried Chicken of Southern California, Inc.*, 308 Ill. App. 3d 106, 120 (1999).

¶ 70    Evidence that was known to Ginny at the time of the hearing is not cause for a reconsideration of the trial court's order. We reiterate what this court wrote over 30 years ago:

> "Trial courts should not permit litigants to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling. Civil proceedings already suffer from far too many delays, and the interests of finality and efficiency require that the trial courts not consider such late-tendered evidentiary material, no matter what the contents thereof may be." (Emphasis omitted.) *Gardner v. Navistar International Transportation Corp.*, 213 Ill. App. 3d 242, 248-49 (1991).

¶ 71    To the extent that Ginny attempts to excuse her failure to present evidence of the Facebook messages based on her counsel's lack of preparedness—in essence, an argument that she received ineffective assistance of counsel—the right to the effective assistance of counsel exists only in criminal matters and not in civil matters such as this. *Kalabogias v. Georgou*, 254 Ill. App. 3d 740, 750 (1993).

¶ 72    The record is clear that Ginny (1) had ample notice of the citation proceeding,

(2) was able to testify on her own behalf and present evidence, and (3) was represented by counsel at both the contempt and citation hearings. Ginny's argument that the trial court deprived her of due process by not allowing her to present evidence of the Facebook messages throughout these proceedings is without merit. Accordingly, we conclude that the trial court did not abuse its discretion by denying her motion to reconsider.

¶ 73                                   III. CONCLUSION

¶ 74            For the reasons stated, we affirm the trial court's judgment.

¶ 75            Affirmed.