2025 IL App (3d) 240502

Opinion filed October 29, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| ESTELLE MICHELLE BATTS, | ) ) | Appeal No. 3-24-0502 Circuit No. 24-CM-144 |
| Defendant-Appellee | ) ) ) | |
| (The Department of Human Services, Dr. Sharon Coleman, and Dr. Agorista Barczak, | ) ) ) ) | The Honorable Paul A. Marchese, |
| Contemnors-Appellants). | ) ) | Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court, with opinion.
Justices Holdridge and Anderson concurred in the judgment and opinion.

**OPINION**

¶ 1        In the context of a criminal case, defendant, Estelle Michelle Batts, filed a petition for a rule to show cause against two doctors who were officials of the Department of Human Services (Department), Dr. Sharon Coleman and Dr. Agorista Barczak, for failing to transfer Batts to a Department facility for fitness restoration treatment in violation of the trial court's order.

Following hearings, the trial court issued the rule to show cause, found the two doctors in indirect civil contempt of court, and eventually imposed a monetary sanction against the doctors for every day that passed going forward without Batts being transferred to a facility. After the transfer had been completed and the monetary sanction had been established, the Department and the doctors (collectively referred to hereinafter as contemnors) appealed. We vacate the trial court's contempt order and the sanction imposed.

¶ 2                                  I. BACKGROUND

¶ 3        In January 2024, Batts was charged in Du Page County, Illinois, with violating a stalking no contact order, a Class A misdemeanor, and a warrant was issued for her arrest. The warrant was later executed on Batts. Batts was given pretrial release, placed on electronic monitoring, and ordered to remain at least 1,000 feet away from, and to have no contact with, the victims,[1] their home, and their place of employment.

¶ 4        In March 2024, the prosecutor filed an amended petition to have sanctions imposed on Batts for repeatedly violating the conditions of her pretrial release. Following a hearing on the petition, the trial court sentenced Batts to 30 days in county jail as a sanction for her violations. After the hearing was concluded, the trial court ordered that a fitness evaluation be conducted of Batts. While the fitness evaluation was pending, the prosecutor filed a petition requesting that the trial court deny Batts's pretrial release. The trial court granted the prosecutor's request.

¶ 5        On April 17, 2024, after the evaluation had been completed, a status hearing was held in the trial court on Batts's fitness. Upon considering the stipulations of the attorneys and the fitness evaluation report, the trial court found that Batts was unfit to stand trial but that there was a

_____

[1]Although the charging instrument referred to only one victim, it is obvious from other documents in the record on appeal that two victims were involved in the underlying criminal case.

substantial likelihood she would attain fitness within the statutory time period if she was provided with a course of treatment. The trial court ordered that Batts be transferred to a Department facility *instanter* for fitness restoration treatment. A court date was scheduled for May 30, 2024, for a status hearing on Batts's fitness and for the receipt of a 30-day treatment report.

¶ 6   Less than a week later, on April 22, 2024, the Department conducted an in-person, preplacement evaluation of Batts, found that she remained unfit to stand trial, and determined that the best inpatient facility for her treatment was the Elgin Mental Health Center. The Department notified the trial court by letter dated that same day of the Department's preplacement evaluation and its findings.

¶ 7   On the May 30 status hearing date, the trial court was told that Batts was still in the county jail and that she had not yet been transported to a Department facility for treatment. Batts's attorney made an oral motion to have Batts released from custody because she had not been placed in treatment. However, the trial court denied the motion because the 60-day deadline contained in the fitness statute (725 ILCS 5/104-17(b) (West 2024)) for Batts to be placed into treatment had not yet passed. The trial court continued the case to June 17, 2024, for another status hearing and ordered the Department to comply with the court's April 17 ruling and transport Batts to a Department facility for treatment. The May 30 order also provided that, if Batts was not transported by the June 17 status hearing date, the Department was required to have a representative present at the hearing to explain why the Department had failed to transport Batts.

¶ 8   On June 3, 2024, the Department sent the trial court a letter regarding Batts's treatment status. The Department informed the trial court that, despite the Department's "best efforts," it had not yet been able to place Batts into treatment because of the Department's backlog of patients and limited bed availability. The Department explained in the letter that (1) it operated forensic

3

treatment programs at four different facilities in the state—Elgin, Chester Mental Health Center, Alton Mental Health Center, and Packard Mental Health Center—and that it supervised an additional program at the Choate Developmental Center; (2) all of the Department's forensic treatment programs were at full capacity; (3) there was an ongoing waiting list of 162 people who were waiting for inpatient admission to the Department's forensic treatment programs and another 142 people who were waiting to be evaluated to determine if inpatient admission was necessary; and (4) the Department had reevaluated Batts and had determined that outpatient fitness restoration treatment was not appropriate for her and that Elgin was the least restrictive placement consistent with Batts's needs. The Department also described in the letter some of the actions that it had taken to address the backlog, such as contracting for additional beds at a local hospital, converting two civil units at one of the Department's facilities into forensic units, pursuing alternative placement options for individuals awaiting admission for fitness restoration, and negotiating with various county sheriffs regarding the purchase of additional bed space to relieve the stress on local jails. The Department assured the trial court in the letter that it was diligently working to safely admit Batts to an inpatient forensic treatment program within the next 30 days; that it would notify the sheriff to transport Batts as soon as a bed became available; and that it would notify the court, the prosecutor, and Batts's attorney when Batts was admitted to a facility.

¶ 9 At the June 17 status hearing, Batts's attorney informed the trial court that Batts was still in the county jail and that she had not yet been transported to a Department facility for fitness restoration treatment. Although a formal appearance had not yet been filed, an assistant attorney general (AAG) from the Illinois Attorney General's Office appeared on behalf of the Department. In response to a question from Batts's attorney, the AAG represented that Batts would hopefully be transported to a facility within the next 14 days.

4

¶ 10    To obtain clarification about Batts's treatment status, Batts's attorney called Dr. Agorista Barczak, a forensic psychologist and the court services administrator for the Department, to testify regarding Batts's position on the waiting list and the Department's plan for transport. Barczak's testimony, to the extent that it is relevant to the issue raised in this appeal, can be summarized as follows.

¶ 11    According to Barczak, Batts was currently about seventh on the Department's waiting list for treatment. Although it was anticipated that Batts would be treated at the Elgin facility, the Department considered admissions from a statewide perspective and also considered their other facilities as possible locations for the placement of Batts. Barczak estimated that Batts would be placed in treatment in approximately three to four weeks but commented that the Department was trying to expedite Batts's placement, assuming that the Department was able to confirm that Batts was decompensating, as Batts's attorney had represented. The evaluator on Batts's case was Dr. Daidra Marano. Dr. Barczak testified that Marano had gone to see Batts in the county jail at least twice, although she did not know the exact date of the second visit, and that Marano had also been in regular contact with the jail staff regarding Batts's mental and physical condition and whether Batts was starting to decompensate. Barczak's understanding was that Batts was delusional but that she was not suffering. Barczak estimated that Elgin had approximately 500 beds that were used for forensic restoration patients. The number of patients discharged from those beds each week varied and could range anywhere from zero to five patients. Female beds tended to come open a lot slower than male beds and generally ranged from zero to two patients per week. If the Department was able to confirm that Batts was truly decompensating, Batts's admission would be expedited and would probably take place within the next week or two.

5

¶ 12 During the status hearing, Batts's attorney advised the trial court that she would be filing a petition for a rule to show cause/petition for indirect civil contempt against the Department for its failure to transport Batts to a facility for treatment. The trial court set the case for July 1, 2024, for a hearing on the petition for a rule to show cause.

¶ 13 A few days after the status hearing, Batts's attorney filed the petition for a rule to show cause. In the petition, Batts's attorney requested that the trial court enter an order requiring Dr. Sharon Coleman, in her capacity as the director of forensic services of the Department, and Dr. Barczak, in her capacity as the court services administrator of the Department, to show cause why they should not be held in contempt of court for violating the trial court's April 17 unfitness order by failing to admit Batts to a facility for treatment within the 60-day period required by the fitness statute. Among other things, Batts's attorney asserted in the petition that Batts was significantly decompensating while remaining in the county jail, a facility that lacked the capacity to address forensic restoration and Batts's mental health concerns.

¶ 14 In addition to filing a petition for a rule to show cause, Batts's attorney also subpoenaed documents from the Department pertaining to the inpatient forensic restoration bed capacity at each facility, the waiting list for admission to a facility for forensic restoration as of the April 17 order and thereafter, and the number of involuntary administration of medication petitions that each facility had filed since 2018. The subpoenaed material was supposed to be tendered in court on June 27, 2024.

¶ 15 On the subpoena return date, the AAG filed a formal appearance in the trial court as the attorney for the contemnors. The AAG tendered the subpoenaed documents to Batts's attorney, and the case was continued to the July 1 hearing date for a hearing on the petition for a rule to show cause. The trial court explained to the attorneys, and the trial court's written order

specifically provided, that if a rule to show cause was issued, it would be returnable to the trial court *instanter*.

¶ 16 The following day, the doctors filed a response opposing the petition for a rule to show cause and requesting that the petition be denied. In the response, the doctors asserted that a finding of contempt would be inappropriate in this case because the Department had complied with the requirements of the fitness statute; had been diligently working to place Batts into treatment; was faced with a number of challenges to placement that were outside of the Department's control, including a substantial increase in admissions for treatment in both the state and the county; and had not willfully violated the trial court's placement order. The doctors attached several supporting documents to their response, including the certified declaration of Dr. Coleman.

¶ 17 In her declaration, Coleman stated as follows. She was the deputy director of forensic and justice services for the division of mental health at the Department. As part of her duties, Coleman oversaw forensic mental health services for the State, including the coordination of inpatient and outpatient placements of adults and juveniles referred through the court system who were found not guilty by reason of insanity or unfit to stand trial. The Department operated forensic treatment programs at the Elgin, Chester, Alton, and Packard facilities. The Department also managed a unit at the Choate facility for defendants with intellectual disabilities and contracted for 24 beds at a local hospital for nonviolent defendants. Those six facilities served all 102 counties in Illinois.

¶ 18 According to Coleman, the Department was currently facing substantial challenges with respect to its ability to admit individuals to its psychiatric hospital system who had been remanded by the court system to the Department for treatment. Since 2019, the Department had experienced an unprecedented 100% increase in referrals by the courts for inpatient care, which placed enormous stress on the Department's resources. As of June 21, 2024, the waiting list for inpatient

admission to Department facilities included 176 individuals who had already been assessed for placement and 132 individuals who were pending assessment, most of whom would require inpatient admission. As the number of referrals had increased, the Department also faced a shortage of the qualified mental health professionals and other staff members that were needed at the Department's facilities and limited community options for step-down placement of individuals who were no longer in need of inpatient treatment. The Department's inability to discharge patients to a step-down setting in the community meant that individuals would remain in the Department's inpatient treatment beds until community placements were found, which restricted the number of new admissions. To address the challenges that it faced, the Department had pursued numerous efforts to expand its capacity, had made significant efforts to expand recruitment and expedite staffing for its mental health facilities, and had worked with community providers to develop additional step-down options for individuals who were appropriate for conditional release or discharge from inpatient care (the specific actions that the Department had taken were described in greater detail in the declaration).

¶ 19        On July 1, 2024, a hearing was held on the petition for a rule to show cause that Batts's attorney had filed. During the hearing, Batts's attorney called Dr. Coleman to testify. Coleman's testimony at the hearing can be summarized as follows. Coleman testified that the Department had several different facilities for people who had been found unfit to stand trial. Alton and Packard were medium-security facilities that each had 100 beds for patients. Chester was an all-male facility that was both medium and maximum security and had 284 beds. The Elgin facility, which was a medium-security facility, had 371 beds, 87 more beds than Chester.

¶ 20        During her testimony, Coleman agreed with Batts's attorney that, oftentimes, defendants who had been referred to the Department for fitness restoration treatment would refuse to take

8

medications. A civil remedy was available by statute that allowed the Department to administer psychotropic medications to such patients involuntarily. If a psychiatrist believed that a patient who was unfit to stand trial needed medication, the psychiatrist could file a petition in the trial court for the involuntary administration of medication. Once an unfit patient started taking psychotropic medication, the medication usually started to work in 14 to 30 days, if it was going to work at all. A patient who responded to medication would typically regain fitness faster but not always. Once a patient was restored to fitness, he or she was sent back to the referring county rather quickly, which would open that patient's treatment bed for another patient.

¶ 21 Coleman also agreed that, over the past several years, the psychiatrists at the Chester facility had consistently filed more involuntary administration petitions than the psychiatrists at the Elgin facility. In 2018, Chester psychiatrists filed 68 petitions, and Elgin psychiatrists filed 9; in 2019, Chester psychiatrists filed 153 petitions, and Elgin psychiatrists filed 6; in 2020, Chester psychiatrists filed 137 petitions, and Elgin psychiatrists filed 5; in 2021, Chester psychiatrists filed 121 petitions, and Elgin psychiatrists filed 7; in 2022, Chester psychiatrists filed 133 petitions, and Elgin psychiatrists filed 11; in 2023, Chester psychiatrists filed 90 petitions, and Elgin psychiatrists filed 46; and in 2024, up to the date of the hearing, Chester psychiatrists had filed 24 petitions, and Elgin psychiatrists had also filed 24. Coleman clarified, however, that the numbers she had stated were the number of petitions that had been filed, not the number of petitions that the trial court had granted.

¶ 22 According to Coleman, when a person was in custody waiting to be transported to a Department facility, the policy of the Department was to clinically monitor that person's condition so that the person's admission could be prioritized if he or she was decompensating. Some of the signs of decompensation that the Department looked for were suffering, weight loss, and other

9

information provided by the jail that would indicate decompensation. Batts's condition had been fairly consistent and stable until the week before the hearing on the petition for a rule to show cause, when the Department learned that Batts had been placed on suicide watch at the jail. The Department only became aware of that information because Batts's attorney had contacted Dr. Marano and shared that information with her. When Coleman was asked during her testimony if she was aware that Batts had five incidents the past week when the deputies at the jail had to put their hands on her, that Batts had been physically restrained, and that Batts was also on emotional watch at the jail, Coleman testified that she was not aware of that information. Batts's attorney did not present any additional evidence at the hearing, however, to establish that those events had actually occurred.

¶ 23    On cross-examination by the AAG, Coleman testified about the process that the Department had followed in trying to place Batts into a facility for treatment. After the Department had received the April 17, 2024, unfitness order, the case was assigned to an evaluator, Dr. Marano, for a preplacement evaluation to be conducted. Upon conducting the evaluation, Marano determined that Batts was still unfit to stand trial and that Batts would need admission to a medium-security facility. Marano designated Elgin as the appropriate place for Batts to receive treatment and notified the trial court of that information by letter dated April 22, 2024. One of the reasons that Elgin was selected as Batts's treatment location was because the Department tried to keep individuals closer to their home court if it was possible and Du Page County, Batts's home court, was in the Elgin facility's catchment area. There was no less restrictive facility in Du Page County that would have been an appropriate place for Batts to receive treatment. Even though the Department was aware of Batts's condition, Batts still did not qualify for immediate placement on the date that the petition for a rule to show cause was filed because the Department had other

10

individuals that had a higher clinical priority for the beds that the Department had available. Batts was reevaluated for admission at various times while she was waiting to be placed.

¶ 24      According to Coleman, the Department did not currently have a bed available for Batts because the Department had a waiting list for treatment beds at its facilities. The waiting list was currently over 300 persons long—about 176 of those individuals had already been assessed for placement, and about 130 of those individuals still needed to be assessed. On average, once a person was transferred to a Department facility, it took 3½ to 4 months to restore that person to fitness. Currently, there were six to seven females that were ahead of Batts on the waiting list. To ensure that individuals who were on the waiting list were quickly placed into a treatment facility, the Department had its evaluators clinically monitor those individuals in person or by contacting the jail staff for updates on the condition of those individuals. If there was some significant change in the person's clinical condition, some decompensation, the Department would make every effort to expedite placement and would move the person ahead on the waiting list. Based on the current information that the Department had received, Batts was being moved up on the waiting list, would probably be within the next three females to be placed, and would hopefully be placed in treatment within the next two weeks.

¶ 25      When the attorneys had finished questioning Coleman, the trial court asked some questions of its own about Department patients who refused to take medications. In response to those questions, Coleman testified that involuntary administration petitions were not filed for every individual in a Department facility who was charged with a misdemeanor offense and had refused to take medication. Petitions were only filed in those cases where the psychiatrists believed that there was enough information to support the petition. The state's attorney's office would then follow through with the petition in mental health court.

¶ 26    After Coleman's testimony ended, Batts's attorney rested. The AAG declined to present any additional evidence, and both sides made closing arguments to the trial court. Batts's attorney argued that the Department had not been making good-faith efforts to place Batts into treatment because the Department's Elgin facility was not filing involuntary administration petitions, which caused the misdemeanor treatment beds at Elgin to remain filled. According to Batts's attorney, if the Department was encouraging its psychiatrists to file more involuntary administration petitions at Elgin, the treatment beds would become available at a much faster rate. Batts's attorney described the issue as a "huge problem" and pointed out that Batts had been in the county jail for 122 actual days, was decompensating, had been placed on suicide and emotional watch, had deputies put their hands on her five times in the past week, and would not have spent 122 actual days in custody if she was not mentally ill. The AAG argued that Batts's petition should be denied because a contempt finding was unnecessary because the Department was already trying to secure Batts's placement in treatment, placement had not been made due to factors outside of the Department's control, the Department had made good-faith efforts to place Batts into treatment and had not willfully defied the trial court's placement order, the Department had acted in compliance with the fitness statute, and the Department had kept the trial court informed about Batts's status and about the Department's efforts to place Batts into treatment. In making those arguments, the AAG pointed out that the fitness statute allowed the Department to go beyond the 60-day placement deadline, if the Department could demonstrate good-faith efforts at placement and a lack of bed availability (see 725 ILCS 5/104-17(b) (West 2024)).

¶ 27    When the arguments concluded, the trial court made its ruling. The trial court explained that the court was in the "first part" of the proceedings and that Batts, as the petitioner, had the burden to prove a *prima facie* case of contempt by a preponderance of the evidence. The trial court

12

stated that it had considered the arguments of the attorneys, the testimony of the witnesses, the documents and attachments to which the attorneys had referred, and the orders contained in the court file. The trial court recognized that the Department had a backlog for placement in treatment and acknowledged that the fitness statute allowed the 60-day deadline for placement to be extended if the Department was making good-faith efforts at placement. Ultimately, however, the trial court determined that part of the reason that the Department's backlog existed was because the Elgin facility, where Batts was supposed to be treated, was not filing involuntary administration petitions. Thus, the Elgin facility was failing to use one of the tools available to restore individuals to fitness and to have those individuals returned to court at a faster rate. Correspondingly, this would also make treatment beds come available at a faster rate. The trial court commented that, in essence, the Department was "deferring the decision as to whether or not to administer meds to people with mental illness who are housed" at the Elgin facility and was not exercising its professional guidance or using the tools available to it to restore people to fitness. The trial court believed that the problem was the result of a policy decision by the Department and did not reflect directly on Dr. Coleman, who the trial court thought was a credible witness. The trial court stated further that it could not find that the Department had made good-faith efforts under the present circumstances and indicated that the court was going to find the doctors in contempt.

¶ 28    The AAG expressed some confusion or disagreement with the procedure that the trial court had followed and questioned whether the trial court was merely issuing a rule to show cause against the doctors or actually finding the doctors in contempt. The trial court indicated that it had made the rule to show cause returnable *instanter*, if it was issued, and that the court was proceeding to a finding on the merits of the contempt petition. The trial court gave the AAG a brief continuance to determine whether the doctors would present any additional evidence.

13

¶ 29       When the case resumed later that day, the AAG informed the trial court that the doctors were not going to present any additional evidence at that time. The trial court found the two doctors in indirect civil contempt of court for the Department's failure to transport Batts to one of its facilities for fitness restoration treatment within the statutory time period as required by the trial court's April 17 unfitness order. In so doing, the trial court again commented that part of the reason that Elgin had a large backlog of patients and limited bed availability was due to the facility's failure to file involuntary administration petitions. The trial court entered a written contempt order and specified in the order that, as a purge condition, the Department was required to transport Batts to a Department facility for fitness restoration treatment by July 16, 2024, at 8:30 a.m. A status hearing was scheduled for that date and time. Batts's attorney asked the trial court to start imposing a monetary sanction against the doctors for their failure to comply with the trial court's order, but the trial court declined to do so at that time.

¶ 30       Prior to the status hearing date, the doctors filed a motion to reconsider, asking the trial court to vacate the finding of indirect civil contempt. In the motion, the doctors repeated many of the same arguments that they had made to the trial court during the hearing on the petition for a rule to show cause/contempt hearing. The doctors also argued that the procedure that the trial court had followed was flawed and had denied the doctors their due process rights to notice and an opportunity to be heard.

¶ 31       At the July 16 status hearing, the trial court was informed that Batts was still in the county jail and had not yet been transferred for treatment. Batts's attorney again asked the trial court to start imposing a monetary sanction against the doctors for their failure to comply with the unfitness order. The trial court again denied that request and continued the case to the following day for

14

hearing on the doctors' motion to reconsider and on the proper sanction to be imposed on the doctors.

¶ 32 After a hearing the following day, the trial court denied the doctors' motion to reconsider. As the sanction for the Department's failure to purge the contempt, the trial court sanctioned the doctors $500 per day ($250 to each doctor) going forward until Batts was transported to a Department facility for treatment. The trial court scheduled a July 24, 2024, status hearing.

¶ 33 On the July 24 status hearing date, the trial court was informed that Batts had been transported to a Department facility for fitness restoration treatment. The trial court ordered that the sanction against the doctors would cease because the Department had complied with the transport command in the unfitness order. The total amount of the sanction was $3,500. The doctors subsequently appealed.

¶ 34                               II. ANALYSIS

¶ 35 On appeal, contemnors argue that the trial court erred in finding the doctors in indirect civil contempt of court for failing to transport Batts for fitness restoration treatment within the 60-day deadline as required by the trial court's unfitness order. Contemnors maintain that the finding of contempt was erroneous for several reasons. First, contemnors assert that the trial court's underlying factual determination—that the Department had willfully violated the trial court's unfitness order—was against the manifest weight of the evidence because (1) the trial court improperly based its determination entirely upon conduct that had occurred prior to the date that the unfitness order was entered (the disparity in the number of involuntary administration petitions that had been filed by Chester and Elgin from 2018 to 2023) and arbitrarily ignored conduct that had occurred closer to the date of the unfitness order (the number of involuntary administration petitions filed by Chester and Elgin in 2024 up to the date of the hearing on the petition for a rule

15

to show cause), (2) there was no evidence that either doctor had any control over the number of involuntary administration petitions filed by psychiatrists at Elgin or Chester, (3) it was unreasonable for the trial court to infer that Department psychiatrists were failing to exercise professional judgment based solely upon the number of involuntary administration petitions that were filed at two different facilities, (4) the trial court's findings and inferences were based upon speculation as to why involuntary administration petitions were not being filed at Elgin and why the waiting list existed, and (5) the uncontested evidence showed that the Department had diligently attempted to place Batts into a treatment facility on a timely basis but that external factors outside of the Department's control had prevented the Department from doing so, even though the Department had taken steps to address those factors and to reduce its backlog. Second, contemnors assert that the trial court's contempt order was also an abuse of discretion because it infringed upon the executive branch's authority to operate its own agencies, infringed upon the professional judgment of Department psychiatrists to make treatment and medication decisions, and created serious ethical and constitutional concerns by essentially requiring Department psychiatrists to file more involuntary administration petitions, regardless of clinical necessity and statutory appropriateness. Third and finally, contemnors assert that the contempt proceedings followed by the trial court in this case violated the doctors' due process rights to notice and an opportunity to be heard because neither the petition for a rule to show cause that was filed nor the rule to show cause identified the involuntary administration petitions as a basis for holding the doctors in contempt and because the trial court improperly merged the rule to show cause and merits stages of the contempt proceedings, which left the doctors unable to prepare a defense. For all of the reasons stated, therefore, contemnors ask that we vacate the trial court's finding of contempt and the monetary sanction that the trial court imposed on the doctors.

16

¶ 36        Batts argues that the trial court's contempt and sanction orders were proper and should be upheld. In short, Batts disagrees with the contemnors' assertions. More specifically, Batts contends first that the trial court's willfulness finding was well supported by the evidence, that the willfulness finding was not based upon improper evidence, and that the trial court properly found that the Department had created the inpatient treatment backlog or had allowed it to continue to exist by failing to use all of the tools available to it to reduce the backlog, including failing to file involuntary administration petitions for patients at the Elgin facility. In making that contention, Batts notes that the doctors failed to present any evidence of their own at the hearing on the petition for a rule to show cause/contempt hearing to establish that their failure to comply with the unfitness order was not willful or that they had a valid excuse for their noncompliance, even though the trial court had given the doctors the opportunity to present evidence that they had of that nature. In addition, Batts maintains, the trial court did not speculate as to its finding of willfulness but, rather, reasonably and logically concluded from the disparity in involuntary administration petitions that the Department's failure to use the tools available to it was a contributing factor in the backlog of unfit individuals waiting for fitness restoration treatment. Furthermore, Batts contends, many of the factors that the Department claimed were external and were contributing to the Department's backlog were actually factors that were under the Department's control, such as the staffing at the Department's facilities, the placement process, and the treatment procedures.

¶ 37        Batts also maintains that the contemnors cannot reasonably argue in this case that the two doctors who held leadership roles in the Department did not have any influence over the methods used by the Department's treating psychiatrists or over the policies and procedures that pertained to the filing of involuntary administration petitions. According to Batts, the trial court did not order the Department to file involuntary administration petitions, exercise control over the Department's

17

treatment methods, or require that patients be given medications involuntarily without due process. Thus, the Department did not infringe on the power of the Department to determine the appropriate form of treatment nor on the bodily autonomy of patients in the Department's care. Instead, Batts maintains that the trial court merely used its contempt powers to control the Department's adherence to the trial court's unfitness order and its command that the Department transport Batts to one of its facilities for fitness restoration treatment, a command that was well within the trial court's authority to make under the fitness statute.

¶ 38    Finally, Batts contends that the trial court did not conduct the hearing on the petition for a rule to show cause/contempt hearing in an improper manner and did not deprive the doctors of their due process rights of notice and an opportunity to be heard. In making that contention, Batts points out that both the petition and the rule stated the basis upon which the doctors were found in contempt (the failure to transport Batts for treatment as required by the unfitness order). Further, Batts points out that the doctors were told multiple times and were well aware that the trial court intended to proceed immediately to a hearing on the merits of the contempt allegation if the rule to show cause was issued and that the doctors were given the opportunity to present any evidence that they wanted to present. Consequently, Batts contends that the contemnors' claim—that the doctors were denied due process during the contempt proceeding—was unfounded. For all of the reasons set forth, Batts asks that we affirm the trial court's contempt ruling and the sanction imposed.

¶ 39    All courts have the inherent power to punish an individual for contemptuous conduct. See *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 19. That power is essential to the maintenance and administration of the court's judicial authority. *Id.* Whether a party is guilty of contempt is a question of fact for the trial court to decide. *Id.* ¶ 22. A reviewing court will not

disturb a trial court's determination in that regard unless it is against the manifest weight of the evidence or the record indicates an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984); *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 58; *In re Marriage of Charous*, 368 Ill. App. 3d 99, 108 (2006). "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotation marks omitted.) *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50.

¶ 40       A contempt proceeding may be classified as being either criminal or civil in nature and also as being either direct or indirect. See *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). In this case, Batts alleged that the doctors had committed indirect civil contempt. In general, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party, with the dignity of the court being only incidentally involved. *Virgin*, 2021 IL App (3d) 190650, ¶ 58; *In re Marriage of Tatham*, 293 Ill. App. 3d 471, 479 (1997). When the contempt occurs outside the presence of the court, it is classified as indirect contempt. *Virgin*, 2021 IL App (3d) 190650, ¶ 58. One of the main characteristics or requirements of a civil contempt proceeding is that the contemnor must be capable of taking the action that the petitioner seeks to have the trial court coerce. See *Betts*, 200 Ill. App. 3d at 44. If the contemnor is unable to comply with the trial court order at issue, a finding of contempt is inappropriate. See *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007) (stating that a contemnor must be able to purge the civil contempt by doing that which the trial court had ordered the contemnor to do); *In re Marriage of Kneitz*, 341 Ill. App. 3d 299, 304 (2003) (recognizing that the contemnor's inability to comply with the trial court order at issue precludes a finding of contempt).

¶ 41　　　In an indirect civil contempt proceeding, the existence of a court order and proof of willful disobedience of that order are essential to any finding of indirect civil contempt. See *Tatham*, 293 Ill. App. 3d at 480. In such a proceeding, the burden falls initially upon the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order. See *Virgin*, 2021 IL App (3d) 190650, ¶ 60; *Charous*, 368 Ill. App. 3d at 107. If the petitioner satisfies that burden, the burden then shifts to the alleged contemnor to show that noncompliance with the court's order was not willful and/or contumacious and that he or she had a valid excuse for failing to follow the court order. See *Virgin*, 2021 IL App (3d) 190650, ¶ 60; *Charous*, 368 Ill. App. 3d at 107-08. Contumacious conduct has been defined as "conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court." (Internal quotation marks omitted.) *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50.

¶ 42　　　The appropriate procedures to be used in a contempt proceeding vary depending upon the type of contempt involved. *Betts*, 200 Ill. App. 3d at 43. A person charged with indirect civil contempt, such as the two doctors in the instant case, is entitled to minimal due process, including the right to notice and an opportunity to be heard. *Id.* at 52-53. In addition, a civil contempt order must be in writing and must specify what the offending party is required to do to purge itself of the contempt. *Pancotto v. Mayes*, 304 Ill. App. 3d 108, 112 (1999).

¶ 43　　　In the present case, although the contemnors and Batts have made multiple arguments, we find it necessary to address only the question of whether the evidence established that the Department willfully and/or contumaciously violated the trial court's unfitness order because resolving that question is dispositive of the issue presented in this appeal. Upon reviewing the evidence that was before the trial court at the time of the hearing on the petition for a rule to show

20

cause/contempt hearing, we conclude that the trial court's finding of indirect civil contempt against the two doctors was against the manifest weight of the evidence.[2] Contrary to the trial court's finding, the evidence before the trial court showed that the Department had worked diligently to try to place Batts into treatment in a timely and safe manner. The Department conducted a preplacement evaluation of Batts within a week after the unfitness order was entered and determined that Batts remained unfit to stand trial and that Elgin was the placement location that best met Batts's needs. Batts's placement in that facility, however, was delayed by a matter outside of the Department's control—the backlog that existed for inpatient treatment beds in the Department's facilities—and was not the result of willful conduct on behalf of the Department after the court order was entered. See *Felzak*, 226 Ill. 2d at 391; *Kneitz*, 341 Ill. App. 3d at 304. During the delay, while Batts was in the county jail waiting to be placed into treatment, the Department evaluator continued to monitor Batts's condition for signs of decompensation by going to see Batts in person and by contacting staff members at the jail to inquire about Batts's condition and reevaluated Batts to determine if Batts's need for treatment or her treatment priority had changed.

¶ 44    The evidence before the trial court also showed that the Department had complied with the steps outlined in the fitness statute for placing a criminal defendant, such as Batts, into a Department facility for court-ordered fitness restoration treatment. As indicated above, the Department conducted a preplacement evaluation of Batts within the first week after the unfitness order was entered and promptly notified the trial court of the evaluation. See 725 ILCS 5/104-17(b) (West 2024) (requiring the Department to evaluate the defendant to determine the most

---

[2]We note that, although the Department did not offer additional evidence after Batts rested during the hearing, the Department's witnesses testified fully as to the issue before the court—reasonable efforts versus willful and/or contumacious conduct.

appropriate secure facility to receive the defendant and, within 20 days after the placement order is transmitted to the Department, to notify the trial court of the designated facility to receive the defendant). In addition, when the Department became aware that it was not going to be able to place Batts within the 60-day deadline provided in the fitness statute, it promptly notified the trial court in detail of the delay and of the reasons for the delay. See *id.* (requiring the Department to admit the defendant to a secure facility within 60 days after the placement order is transmitted to the Department, unless the Department can demonstrate good-faith efforts at placement and a lack of bed and placement availability). The Department also had its representatives appear in court, when directed, to explain in person (or through remote video) the reasons for the delay and to answer any questions that the trial court or the attorneys had regarding Batts's treatment status.

¶ 45 We think it is worth noting that the legislature clearly contemplated that that there would be occasions when the Department would be unable to place defendants in a secure facility within the 60-day time frame set forth in the statute due to a lack of placement availability (beds) because it included a procedure for such occasions in the statute. If the defendant cannot be placed within the 60 days due to a lack of beds and the Department demonstrates "good faith efforts at placement" then "the Department shall provide an update to the ordering court every 30 days until the defendant is placed." 725 ILCS 5/104-17(b) (West 2024). Nothing in the statute or case law requires courts to follow the procedure set forth by the legislature for this situation to give the Department additional time to place a defendant before going directly to a contempt proceeding; however, it would seem the court in the present case took the most extreme approach by proceeding to a contempt hearing the same day the petition was returned and the rule issued and conducting not one of the 30-day status hearings contemplated in the statute.

¶ 46    Based upon the Department's good-faith efforts to place Batts into fitness restoration treatment and its compliance with the steps outlined in the fitness statute, we must conclude that the trial court's findings of willfulness and contempt were against the manifest weight of the evidence and that its ruling, therefore, constituted an abuse of discretion. Contrary to Batts's assertion on appeal, the trial court could not reasonably infer, based solely upon the difference in the number of involuntary administration petitions filed at the Elgin and Chester facilities from the years before Batts's detention, that the psychiatrists at Elgin were willfully failing to exercise their professional judgment and failing to file involuntary administration petitions while Batts was in custody.

¶ 47    It is also problematic that, in making its contempt finding, the trial court focused on statistics comparing involuntary administration petitions filed by the psychiatrists at the Elgin and Chester facilities from years 2018 to 2023 (prior to the defendant's arrest and the court's transfer/fitness restoration order in this case in April 2024), which were in great disparity, and discounted the 2024-to-date statistics, which demonstrated no disparity. The focus of a court in a civil contempt proceeding should be on the actions of the respondent *after* the court's order that is the basis of the contempt allegation. See *In re J.S.*, 2022 IL App (1st) 220083, ¶ 76. Although the court could consider the statistics from prior years as relevant background information (*People v. Weinstein*, 2024 IL App (2d) 230062, ¶ 148), the contempt finding should be based on conduct after the order was entered.

¶ 48    We acknowledge the challenges and urgency for trial courts and county jails to get unfit defendants out of their jails and into the Department's facilities so that they can receive the necessary treatment. However, the evidence here was insufficient to support a finding that these two doctors willfully or contumaciously violated the court's order. Accordingly, we vacate the

23

trial court's finding of indirect civil contempt against the doctors and the monetary sanction that the trial court imposed.

¶ 49    In reaching the conclusion that the trial court's ruling in this case was erroneous, we have considered the Second District's decision in *Weinstein*, 2024 IL App (2d) 230062, a case with somewhat similar facts that involved the Department and some of the same doctors. However, *Weinstein* is distinguishable from the present case. In *Weinstein*, the trial court in Lake County found the Department guilty of indirect civil contempt in multiple cases and imposed monetary sanctions against the Department because of the Department's failure to promptly admit criminal defendants who had been found unfit to stand trial to inpatient fitness restoration treatment in the Department's facilities. *Id.* ¶ 1. On appeal, the appellate court upheld the trial court's findings of contempt and the sanctions imposed against the Department. *Id.* In so doing, the appellate court focused upon, among other things, (1) the Department's failure to comply with the specific requirements contained in the trial court's unfitness orders, which mirrored the specific requirements contained in the fitness statute and required the Department, as to each defendant, to determine appropriate placement and provide appropriate treatment, to render an opinion within 30 days of the unfitness order as to the probability of the defendant attaining fitness within the statutory time period, and to file a treatment plan for the defendant if such a probability existed; (2) the Department's failure to comply with the fitness statute, which required the Department to admit a defendant to treatment within 30 days after the trial court's unfitness order had been entered; (3) the Department's policy that it would not conduct a full evaluation of a defendant until after the defendant was admitted to one of its facilities, which was a limitation that the Department had imposed upon itself; (4) the Department's failure to monitor or track the defendants at the jail who were waiting to be placed in a facility; and (5) the evidence provided in Coleman's declaration

24

and testimony that funding was not an issue for the Department, which cut against the Department's claim that its failure to comply was due to matters outside of its control, such as increased referrals, staffing shortages, and a lack of capacity at its facilities. *Id.* ¶¶ 119, 128, 138-45.

¶ 50     The *Weinstein* case is distinguishable from the present case for several reasons. First, the trial court in the present case focused primarily upon the number of involuntary administration petitions that had been filed at the Elgin and Chester facilities in years before the order at issue was entered and, from that evidence, developed a series of unwarranted inferences on which its ruling was based. The trial court inferred that the treating psychiatrists at Elgin were not filing involuntary administration petitions in cases where such petitions should have been filed, that the Department had failed to encourage its psychiatrists to file such petitions or to ensure that the psychiatrists had done so, and that the psychiatrists' and the Department's failure in that regard was a partial cause of the Department's treatment backlog.

¶ 51     Second, the trial court's unfitness order in the present case merely required that the Department transport Batts for treatment *instanter*. The unfitness order did not contain the detailed requirements that were contained in the unfitness orders in the *Weinstein* case (see *id.* ¶¶ 119, 128). Indeed, the trial court's unfitness orders in the *Weinstein* case, by spelling out the requirements of the fitness statute that were in effect at that time and making those requirements part of the trial court's order, could serve as a road map for trial courts to follow in future cases to better ensure that the Department complies with the requirements of the fitness statute and avoids a finding of contempt.

¶ 52     Third, the fitness statute in effect during the time frame involved in the present case did not require the Department to file its 30-day treatment report until 30 days after Batts had been

admitted to one of the Department's facilities (see 725 ILCS 5/104-17(e) (West 2024)), whereas the fitness statute in effect during the *Weinstein* case required the Department to file the 30-day treatment report for each defendant within 30 days after the unfitness orders had been entered (see 725 ILCS 5/104-17(e) (West 2020); *Weinstein*, 2024 IL App (2d) 230062, ¶ 100 n.2), which the Department in *Weinstein* was failing to do. See *Weinstein*, 2024 IL App (2d) 230062, ¶ 119. The Department's failure in that regard seemed to be a significant factor with both the trial and appellate courts in the *Weinstein* case. See *id.* ¶¶ 24, 29, 65-66, 82, 93, 119-20, 127-28.

¶ 53    Fourth, in the instant case, no evidence was presented that funding was not an issue in the backlog for the Department, as was presented in the *Weinstein* case. See *id.* ¶ 145. Perhaps more significantly, nor was sufficient evidence presented in the instant case that the Department had failed to monitor Batts while she was in the county jail awaiting placement, nearly to the extent that the Department had failed to monitor the defendants in *Weinstein*. See *id.* ¶¶ 138-44. For example, regarding one of the defendants in *Weinstein*, there was testimony that no one from the Department communicated with the jail mental health staff at the time of the hearing (*id.* ¶ 22), and the court found that Dr. Barczak "did not know that her subordinate was not coming to the jail[, which] showed willfulness" (*id.* ¶ 24). In the present case Dr. Barczak testified that Dr. Marano had been in regular contact with the jail and had visited the defendant twice. Thus, we agree with the decision in *Weinstein*; however, it is factually distinguishable from the present case.

¶ 54                                    III. CONCLUSION

¶ 55    For the foregoing reasons, we vacate the trial court's finding of indirect civil contempt against the doctors and the monetary sanction that the trial court imposed.

¶ 56    Vacated.

*People v. Batts*, 2025 IL App (3d) 240502

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 24-CM-144; the Hon. Paul A. Marchese, Judge, presiding. |

| | |
|---|---|
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Benjamin F. Jacobson, Assistant Attorney General, of counsel), for appellants. |

| | |
|---|---|
| **Attorneys for Appellee:** | John W. Radosevich and Katherine A. McCollum, of Del Re Law Group, of Waukegan, for appellee Estelle Michelle Batts. <br><br> No brief filed for other appellee. |